Trinitee G. Green (SBN 24081320)
Polsinelli PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tggreen@polsinelli.com

Jeremy R. Johnson (*Pro Hac Vice* Pending)
Brenna A. Dolphin (*Pro Hac Vice* Pending)
Polsinelli PC
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
bdolphin@polsinelli.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Northwest Senior Housing Corporation, *et al*.,[1] | Case No. 22-30659 (MLV) |
| ……………………. Debtor. | |
| Northwest Senior Housing Corporation, | |
| ……………………. Plaintiff, | |
| v. | Adv. No. 22-30660 (MLV) |
| Intercity Investment Properties, Inc., and Kong Capital, LLC, | |
| ……………………. Defendants. | |

## COMPLAINT

Plaintiff, Northwest Senior Housing Corporation d/b/a Edgemere, the above-captioned

debtor and debtor-in-possession ("**Edgemere**") in the above-captioned chapter 11 cases (the

"**Chapter 11 Cases**") and the plaintiff in the above-captioned adversary proceeding (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Northwest Senior Housing Corporation (1278) and Senior Quality Lifestyles Corporation (2669). The Debtors' mailing address is 8523 Thackery Street, Dallas, Texas 75225.

"**Adversary Proceeding**"), by its undersigned counsel, hereby files this complaint (the "**Complaint**") against defendant Intercity Investment Properties, Inc. ("**Intercity**") and Kong Capital LLC ("**Kong**" and, together with Intercity, the "**Defendants**"), and alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## NATURE OF ACTION

1.      Since 1999, Edgemere has owned and operated a continuing care retirement community (the "**Community**" known as a "**CCRC**") in the Dallas metropolitan area.  Over the course of the last several months, Defendants have engaged in unprecedented and unlawful activities attempting to destroy Edgemere's business.  Despite being under a non-disclosure agreement with Edgemere, and in possession of Edgemere's confidential information, Defendants directly contacted the press, Edgemere's residents, and Texas regulators without notice to Edgemere, all for the singular purpose of trying to manufacture an improper basis to terminate Intercity's 52-year ground lease with Edgemere and wrongfully retake the property on which the Community sits – all so that they can repurpose it to make a windfall profit.

2.      Defendants' combined efforts would not only destroy Edgemere's business, but also directly endanger the well-being of the more than 400 senior citizens that depend on Edgemere to provide both a safe place to live and certain health care services.  Defendants' actions would result in the loss of the significant entrance fee deposits paid by residents to become part of the Community, the loss of their homes, and the loss of the health care services upon which they rely.  Defendants' unlawful conduct has significantly damaged Edgemere's business and the Community, and Edgemere is entitled to significant compensatory and exemplary (including punitive) damages as well as equitable relief to ensure Edgemere's continued operations without Defendants' interference.

83065846.1

## PARTIES

3.     Plaintiff Edgemere is incorporated as a Texas not-for-profit corporation exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code ("**IRC**"). Edgemere was formed to build and operate the Community, a CCRC located at the Property (as defined below), and provide housing, health care, and other related services to over 400 residents (each a "**Resident**," and collectively, the "**Residents**") in the independent living, assisted living, memory care, and skilled nursing facilities at the Property.  Edgemere has operated at the Property since 1999, and Edgemere is the current lessee to the Lease (as defined below).  Edgemere is certified pursuant to Section 33.102 of the Texas Administrative Code, and is qualified to be a CCRC.

4.     Defendant Intercity is a Texas corporation with its principal place of business located at 4301 Westside Dr. #100, Dallas, TX 75209-6546.  Intercity is a real estate investment company that holds a portfolio of retail, office, mixed-use, and multi-family assets.  Intercity is the purported owner of the Property, which it leases to Edgemere pursuant to the Lease.  Intercity is not certified to operate a CCRC pursuant to Section 33.102 of the Texas Administrative Code.

5.     Defendant Kong is a Texas limited liability company with its principal place of business located at 2309 Bridle Path, Austin, TX 78703-3207.  Kong is a real estate private equity firm that claims to specialize in strategic investments in the senior housing sector, but Kong is not authorized to operate a CCRC in Texas.  At all relevant times, Kong has been acting as an agent for Intercity.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over the matters raised in this Complaint under 28 U.S.C. § 1334. Such jurisdiction is core under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), and (O). To the extent

83065846.1

that any matter raised in this Complaint is not core, Edgemere consents to the Court's entry of final orders under 28 U.S.C. § 157(c)(2).

7.      Venue of this Complaint is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The claims alleged herein are properly brought as an adversary proceeding pursuant to, inter alia, Fed. R. Bankr. P. 7001(1), (2), (7), (8), and (9).

## FACTUAL BACKGROUND

### A.      Edgemere's Facilities and Operations

9.      Edgemere is a CCRC situated on 16.25-acre site located in Dallas, Texas.  The Community consists of a total of 504 units separated into (i) an independent living section of 304 units, consisting of one-, two- and three-bedroom units, ranging from 800 to 2,026 square feet, and (ii) a health center, consisting of multi-level housing facilities including 68 assisted living units, 45 memory care support assisted living units, and 87 skilled nursing beds.  The units are built around two courtyards, and provide a high level of staffing and specialists.  The mix of independent living, assisted living, memory care, and skilled nursing allows the Residents to "age-in-place" so that they can live at the Community and continue to receive increasing levels of care as they age.

10.     Edgemere has long been regarded as a premier luxury community in its market, providing high-end amenities for which Residents contract and rely upon as they enter the Community.  To live at the Community, the Residents enter a "Residency Agreement" that requires payment of a sizeable, one-time, partially refundable entrance fee and a monthly service fee.  In return, the Community provides the Residents different levels of care and the opportunity to age comfortably and safely in place.

11.     Specifically, a Resident will pay an entrance fee (the "**Entrance Fee**"), generally ranging from $345,000 to $1,454,000, and fixed monthly fees (the "**Monthly Service Fees**") for Edgemere's commitment to provide life care services for the duration of the Resident's life.

Edgemere agrees to provide these services regardless of whether the Resident's needs change over time; in some cases a Resident may require additional services or the costs of providing such services may increase for Edgemere. Significantly, Edgemere's commitment to provide life care services continues even if a Resident's financial condition deteriorates and he or she is unable to continue to make monthly payments.

12.     As is common in CCRC facilities, each of the Residents agrees that, so long as other contractual conditions are met, a large portion of his or her Entrance Fee will be refunded to the Resident or the Resident's estate when the Resident moves out or dies. And Residents, like other CCRC residents, agree that any Entrance Fee refund will only be paid once another Resident moves into the specific unit and Edgemere receives a new Entrance Fee for the vacated unit.

**B.      The Bonds**

13.     The Community was originally funded by tax-exempt bonds, which were refinanced in 2015 and 2017. Currently, Edgemere owes approximately $107 million in obligations under its bonds, which are secured by liens on certain of Edgemere's assets as set forth in the applicable bond documents. UMB Bank, N.A., acts as the indenture trustee and master trustee (the "**Trustee**") under those bonds (the "**Bonds**").

**C.      The Lease and Non-Disclosure Agreement**

14.     Defendant Intercity purports to own the real property and improvements located at 8523 Thackery Street, Dallas, Texas 75225 (the "**Property**"), and more particularly described as Lots I thru 7, Block 8/5464 of Prestonville, an Addition to the City of Dallas, Dallas County, Texas, according to the Plat thereof recorded in Volume 12, Page 83, Map Records, Dallas County, Texas.

15.     On or about November 5, 1999, Edgemere and Defendant Intercity entered into a Ground Lease by which Edgemere leased the Property (the "**Lease**"). A true and correct copy of the Lease is attached hereto as **Exhibit A** and is incorporated herein by reference.

16.     When Edgemere and Intercity entered into the Lease, the parties knew and understood that Edgemere intended to operate the Community as a CCRC regulated by the Texas Department of Insurance.  *See* Lease, Exh. A, § 5.5 (Lessee (Edgemere) will use the Land only for the development, construction and ownership of the Project, generally described herein, and specifically only for retirement housing or a senior living community); § 5.18 (Lessee (Edgemere) may, without the consent of Lessor and without the payment of additional rent, enter into life care contracts or sublet, rent or license residential apartments, rooms, living spaces in the Improvements and ancillary commercial uses reasonably related to the occupancy thereof, provided that the purpose of such agreement is consistent with Section 5.5 of this Lease …).  Intercity agreed that Edgemere was entitled to use the Property to operate the Community for the full term of the Lease free from Intercity's interference.  (*See id*. §§ 2.3, 2.4).

17.     Senior Quality Lifestyles Corporation ("**SQLC**") was the original parent company and sponsor of Edgemere, and SQLC encountered financial difficulties over the years leading up to 2019.  In June 2019, Lifespace Communities, Inc. ("**Lifespace**"), a non-profit owner and successful operator of a nationwide portfolio of CCRC's, entered the picture and became the new sponsor and parent company of Edgemere and SQLC.  Aiming to revitalize and sustain the Community, Lifespace also took over management of Edgemere.

18.     In late 2020 and early 2021, Edgemere, under the new leadership of Lifespace and now navigating the fallout from the worldwide COVID-19 pandemic, engaged professionals to evaluate its capital structure, including its significant liabilities, to develop strategies to improve Edgemere's operations and long-term financial stability.

19.     Edgemere attempted to engage in negotiations with Intercity regarding the Lease or to buy the Property, but Intercity refused to respond.  Edgemere then stopped paying rent in September 2021, and immediately thereafter, Intercity finally began to engage in negotiations.

20.     As a condition to sharing highly-sensitive, confidential information regarding Edgemere and the Community, Edgemere required Intercity to sign a Confidentiality and Non-Disclosure Agreement dated as of September 7, 2021 (the "**NDA**"), a true and correct copy of which is attached hereto as **Exhibit B** and is incorporated herein by reference.

21.     The NDA not only prohibited Intercity from disclosing Edgemere's confidential information (as defined in the NDA) (the "**Confidential Information**") to any third parties,[2] but also expressly limited the way Intercity could use such Confidential Information.  Specifically, Intercity agreed that it would only use Edgemere's Confidential Information to evaluate a potential restructuring of the Lease (or obligations under the Bonds), or with respect to its rights under the Lease.   (Exh. B, at § 2). And Intercity expressly agreed that it would not use Edgemere's Confidential Information "for any competitive purpose."  (*Id*. at § 3).

22.     As part of its analysis and negotiations, Edgemere realized that the Lease contained terms that were inappropriate for a CCRC and that violated applicable law.  As described in greater detail in Count 7 below, the Lease purports to provide that, upon termination, Intercity can assume Edgemere's Residency Agreements with Residents and otherwise step into Edgemere's shoes, and could, despite the terms of the Residents' Residency Agreements and the substantial Entrance Fees

---

[2] Although the NDA allows disclosures to certain Representatives, the NDA provides that the parties "agree to instruct their respective Representatives not to disclose Confidential Information to any Person without the written permission of the disclosing party providing such Confidential Information."  (Exh. B, § 2). In other words, disclosure of Confidential Information by a party's Representative constitutes a breach by such party under the NDA. (*See id*. § 11 ("Each party shall be responsible for any breach of this Agreement by any of its Representatives.")).

paid, seek to expel or remove the Residents from the Community. But Intercity is not authorized to own or operate a CCRC, making the Lease contrary to Texas law and public policy. (*Id*. § 8.2)

23.     Over the next several months, Edgemere and Intercity, along with the Trustee, engaged in discussions regarding the Lease, including detailed discussions of specific terms by which the Lease could be restructured (as well as potential terms to restructure the obligations under the Bonds), with the aim of a global resolution among Edgemere, Intercity, and the Trustee. To facilitate those discussions, and advance what Edgemere assumed were good faith negotiations, Edgemere provided Intercity with a substantial volume of highly confidential and proprietary information, including financial and operational information relating to Edgemere and the Community.

24.     On information and belief, Intercity never intended to keep its promises under the NDA, but instead, used the NDA to gain information it could use to its advantage to develop its own business plan and strategy to intentionally destroy Edgemere's business and retake possession of the Property. Rather than using Edgemere's Confidential Information for permitted purposes under the NDA, Intercity conducted due diligence on how to put the Property to a competing use – a use that would put Edgemere out of business and result in the Residents never recovering their Entrance Fees.

25.     For example, on September 17, 2021, only ten (10) days after executing the NDA, Intercity issued a Notice of Lessor's Intent to Terminate the Lease (the "**Notice to Terminate**").

## D.     The Forbearance Agreement

26.     During this time, Edgemere, Intercity, and the Trustee were also negotiating a forbearance agreement to facilitate discussions about the Lease. Intercity dragged out the forbearance negotiations for more than three months until December 2021, and in the meantime, was preparing its strategy to destroy Edgemere's business.

8

27.     Intercity waited until December 21, 2021 to agree to enter into the long-contemplated Forbearance Agreement (the "**Forbearance Agreement**") with Edgemere and the Trustee that was intended to cover a number of months over the fall and spring. While Intercity's foot-dragging caused the initial term of the Forbearance Agreement to cover only ten days between December 21, 2021 and December 31, 2021, it was premised on – and specifically described – the parties' intent to extend the Forbearance Agreement through March 31, 2022.   A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit C** and is incorporated herein by reference.

28.     The Forbearance Agreement included specific milestones that extended through March 2022.  Specifically, the Forbearance Agreement expressly contemplated that Edgemere would provide a Lease restructuring term sheet by December 21, 2021, with Intercity's substantive response due 14 days later, on January 4, 2022. (*See* Exh. C. § II(e)(1), (2)).  Likewise, the Forbearance Agreement required submission of "13-week cash budget" extending from December 10, 2021 into March 2022.   (*See id*., § II(e)(1)-(6)).

29.     Just like with the NDA, Intercity had no intent to perform under the Forbearance Agreement.

30.     Edgemere provided the contemplated Lease restructuring term sheet to Intercity earlier than required, on December 6, 2021.  Despite its express agreement to provide a substantive written response and comments to Edgemere's term sheet, Intercity did not respond.  When Edgemere inquired about Intercity's failure to respond, Intercity stated that it was not interested in restructuring the Lease.

31.     Under the Forbearance Agreement, Edgemere was also required to wire $357,878.59 to Intercity, representing one month's rent due under the Lease, by December 21, 2021. In turn, Intercity was obligated to deliver a notice rescinding the Notice to Terminate.

32.     Edgemere wired the $357,878.59 to Intercity on December 21, 2021.  Intercity did not rescind the Notice to Terminate.

33.     The Forbearance Agreement also provided that Edgemere would pay Intercity's reasonable professional fees related to the Forbearance Agreement within fourteen days after receiving invoices reflecting the fees.  Before the end of December 2021, after Edgemere had paid the agreed one-month rent payment, Intercity claimed the Forbearance Agreement was not effective because Edgemere had not yet paid Intercity's professional fees.  At the time, Intercity had neither demanded payment of those fees nor provided invoices or supporting documentation for the professional fees.   Edgemere's time to pay the professional fees had not even started running, let alone expired.

34.     Intercity provided Edgemere with invoices on January 7, 2022, for approximately $299,000 in professional fees, and provided wiring instructions on January 10, 2022 for payment of the professional fees.  Edgemere wired the $299,000 on January 10, 2022.

35.     Immediately thereafter, Intercity advised Edgemere and the Trustee, for the first time, that it was not willing to extend the Forbearance Agreement.  Intercity did not, of course, return any of the payments it had just received.

36.     On January 17, 2022, Intercity, through counsel, wrote Edgemere to rescind its Notice to Terminate.  But in the same letter, Intercity advised Edgemere that the Notice to Terminate was automatically reinstated effective immediately.

37.     Intercity never had any intention of performing the NDA or Forbearance Agreement, negotiating with Edgemere, or extending the Forbearance Agreement.  To the contrary, Intercity acted in bad faith and delayed any substantive responses to Edgemere while it prepared its takeover strategy.

**E.     Defendant Intercity Breaches the NDA and Tries to Destroy Edgemere's Business and the Community**

38.     Upon information and belief, Intercity, through its agent and representative Kong, mined social media outlets, including Facebook, to identify individual Residents of the Community.

39.     Despite its obligations under the NDA and its possession of Edgemere's Confidential Information, Intercity, through its agent Kong, then directly contacted numerous Residents and began attempting to frighten them that Edgemere would be unable to repay their Entrance Fees – without explaining, of course, that Intercity's competing plan was to repurpose the Property and leave the Residents no hope of a refund of their Entrance Fees. Despite being under the NDA, Intercity, through its agent and representative Kong, also openly discussed Edgemere's Confidential Information obtained under the NDA, including non-public information about Edgemere's financial condition and strategic plans.

40.     In addition, despite being under NDA, on February 22, 2022, Intercity, through its counsel, sent a letter (the "**Intercity Letter**") to Edgemere and numerous third parties – including the Trustee, the Community's Residents' Association, the Texas Attorney General, and the Texas Department of Insurance, which appears to disclose and was necessarily based on Confidential Information relating to Edgemere, its financial condition, including (a) the discussions and negotiations related to the Transaction (as defined in the NDA), (b) the financial condition of

83065846.1

Edgemere, and (c) Edgemere's business plans. A true and correct copy of the Intercity Letter is attached hereto as **Exhibit D** and is incorporated herein by reference.

41. The Intercity Letter indicated that Intercity had hired Kong to consult on matters relating to the Lease and the Transaction, but also revealed Intercity's scheme to work with Kong to wrest control of the Community from Edgemere and the Residents. Specifically, the Intercity Letter acknowledged the scheme by stating "[Kong] has the necessary expertise and personnel to convert the [Community] from a CCRC into a senior living rental facility." (Exh. D, p. 2). And the Intercity Letter made clear this scheme was real and already underway by demanding that Edgemere work with Intercity "to effectuate this conversion to a rental community as safely and seamlessly as possible." (*Id*. p. 3).

42. Further, despite being under NDA, Intercity, through its agent Kong, communicated with *The Dallas Morning News* ("**DMN**"). On February 22, 2022, Lifespace received an email from Natalie Walters, a reporter with DMN, requesting comment on a story about Edgemere that DMN planned to publish imminently. In the email, Ms. Walters identified herself as the "money" reporter for DMN. Ms. Walters indicated that she had been contacted by Kong and provided a list of questions regarding Edgemere's Confidential Information. Despite being under NDA and in possession of Edgemere's Confidential Information, Defendants communicated with Ms. Walters in an attempt to destabilize the Community, with full knowledge, awareness, and intent that such Confidential Information would be communicated to the public in violation of the NDA, and to the detriment of Edgemere, all as part of their scheme to destroy Edgemere's business.

43. The DMN subsequently published several negative stories about Edgemere, and the negative press coverage continues. Indeed, the initial DMN story quoted Kong, and referenced

landlord concerns in its caption.  *See* Natalie Walters, "High-end Dallas retirement community's financial woes worry investors, landlord," *Dallas Morning News* (February 27, 2022) (the "**February 27 Article**"), a true and correct copy of which is attached hereto as **Exhibit E** and is incorporated herein by reference.

44.     Among other things, in a deliberate effort to destabilize the Community and dissuade prospective residents from joining the Community, and despite knowing that Edgemere had previously implemented an Entrance Fee escrow account to safeguard future residents' Entrance Fee deposits during the restructuring discussions, Kong falsely stated in the February 27 Article that "[i]t's unfair and unjust for Edgemere to continue to take deposits from future residents under current circumstances."

45.     Further, in its attempt to destroy the Community, and despite being under NDA, Kong's CEO provided inflammatory quotes to DMN, including stating "I fear the residents are on a sinking ship and some of them may not even know it."

46.     Upon information and belief, Intercity, through its agent and representative Kong, disclosed additional Confidential Information to DMN in an effort to convince that outlet to publish an additional article regarding Edgemere and its financial situation and, in particular, the purported uncertainty regarding the repayment of the Residents' Entrance Fees.

47.     As a result of Intercity's and Kong's communications with DMN despite being under NDA, DMN then published an additional article on March 16, 2022. *See* Natalie Walters, "'We are very nervous': Families of former Edgemere residents worry they may not get deposits back," *Dallas Morning News* (March 16, 2022) (the "**March 16 Article**").  A true and correct copy of the March 16 Article is attached hereto as **Exhibit F** and is incorporated herein by reference. Ms. Walters also did at least one television news interview as a result.

48.     Defendants' actions have significantly damaged Edgemere's operations, exactly as Defendants intended.

**F.     Intercity's Bad Faith and Disruptive Inspection Demands**

49.     In addition to its disruptive media campaign and improper Resident communication strategy, in November 2021, Intercity demanded a comprehensive inspection of Edgemere and the Property (the "**November 2021 Inspection**").  Edgemere accommodated Intercity's demand.

50.     Then again, immediately after reneging on its prior commitment and refusing to extend the Forbearance Agreement, Intercity demanded another comprehensive inspection of Edgemere and the Property in January 2022 (the "**January 2022 Inspection**").  Edgemere again accommodated, and this time, Kong accompanied Intercity on the January 2022 Inspection.

51.     During the January 2022 Inspection, rather than evaluate the current condition of the Property, Kong, in furtherance of Intercity's scheme to wrest control of the Property and Community from Edgemere, grilled Edgemere's executives and staff regarding Edgemere's financial situation and general operations.

52.     In March 2022, all rent and other defaults were cured, including payments to Intercity of nearly $3.2 million.[3]  In response to this substantial payment, Intercity provided Edgemere an estoppel certificate confirming that Edgemere had cured all defaults and no remaining or additional default was pending (the "**Estoppel Certificate**").  A true and correct copy of the Estoppel Certificate, dated March 7, 2022, is attached hereto as **Exhibit G** and is incorporated herein by reference.  Nonetheless, immediately after all defaults under the Lease were

---

[3] On information and belief, $250,000 of the approximately $3.2 million cure payment was to reimburse Intercity for professional fees it claimed it paid Kong in conjunction with the Forbearance Agreement and other aspects of the negotiations with Edgemere.  As established herein, Intercity instead remarkably required Edgemere to reimburse it for fees it paid to its partner and agent, Kong, to develop and implement its unlawful and malicious scheme to wrest control of the Community from Edgemere for Intercity's and Kong's windfall profit.

cured in March 2022, Intercity demanded a third comprehensive inspection of the Property, now requesting at least four (4) days on site at the Community (the "**March 2022 Inspection Demand**").

53.     Further, despite Intercity's actions to destroy Edgemere's business, Intercity demanded in mid-March that Edgemere sign a certification that Intercity had not committed any defaults under the Lease.   Based on all of Intercity's bad acts, Edgemere refused to sign the certification.   Intercity used that refusal as a pretense to send Edgemere another Notice of Default, asserting that the failure to sign the certificate would permit Intercity to exercise rights to take over the Property in thirty days, or as of April 16, 2022.   This letter forced Edgemere to commence these Chapter 11 Cases before the purported April 16 deadline.

54.     On information and belief, the November 2021 Inspection, January 2022 Inspection, and March 2022 Inspection Demand were the first and only inspections and demands made by Intercity during the entire term of the Lease.   Intercity and its agent and representative Kong used these inspections to evaluate how to prepare the Community for an alternative use after they destroy Edgemere's business and thereby create a windfall for themselves while causing Residents to lose their homes and forfeit their substantial Entrance Fee deposits. In its counsel's March 24, 2022 letter, Intercity even acknowledged that part of the purpose of the March 2022 Inspection Demand was to search for additional undisclosed defaults under the Lease, despite recently inspecting the Property twice, having just accepted more than $3.2 million, and confirming in the Estoppel Certificate that Edgemere had cured all defaults under the Lease.   A true and correct copy of Intercity counsel's March 24, 2022 letter is attached hereto as **Exhibit H** and is incorporated herein by reference.

55.     Intercity's repeated and continuing demands for inspections were and are made in bad faith and intended to disrupt Edgemere's business, sow additional seeds of fear and discord among the Residents, and create the false impression that Edgemere will be unable to continue to provide care and service to the Residents.

### G.     Defendants' Actions Demonstrate a Concerted And Malicious Effort to Harm Edgemere's Business and Wrongfully Obtain Control of Edgemere

56.     Defendants are attempting to drive Edgemere out of business so that Intercity can wrongfully takeover the Community and the Property to repurpose it for a competing use.

57.     Unfortunately, Defendants' efforts to harm Edgemere's business are working.  In the aftermath of Defendants' breaches of the NDA and other misconduct, call volume from prospective residents has dropped, tours among prospective residents have diminished, referrals of existing Residents to higher levels of care within the Community are down, and individuals previously committed to joining the Community have delayed closing on their contracts. In fact, in 2021, despite the ongoing COVID-19 pandemic, Edgemere closed on contracts with new residents for 48 units, an average of four each month.  In the two months since Kong and Intercity caused the first article in DMN to be published, Edgemere has not closed any new Residency Agreements.  Edgemere is not making sales, despite the fact that Edgemere has in place an Entrance Fee escrow account to safeguard future residents' Entrance Fee deposits during the restructuring process.

58.     Further, the string of articles in DMN, which Defendants initiated despite their NDA obligations (which Defendants never intended to honor), continue to damage Edgemere's business.

59.     Defendants' egregious misconduct has directly damaged Edgemere's business and exacerbated the financial situation Edgemere has been working for months to comprehensively address.

60.     Defendants' intentional actions to harm Edgemere's business not only dissuade potential new residents from joining the Community, but also diminish Entrance Fee revenue that is necessary for Edgemere to fulfill obligations under the Residency Agreements and to service its obligations under the Bonds.

61.     Likewise, Intercity's disavowal of the Forbearance Agreement, including entering into the Forbearance Agreement with no present or actual intent to fulfill its obligations thereunder, resulted in Intercity harvesting in excess of $650,000 in cash from Edgemere (and nearly $3.9 million overall) while providing no consideration or benefit to Edgemere in return.

## COUNT 1

### (Breach of Contract (NDA) – Against Defendant Intercity)

62.     Edgemere incorporates by reference the allegations in all preceding paragraphs as if set forth fully herein.

63.     Edgemere brings this claim against Defendant Intercity to enforce its rights under the NDA.

64.     The NDA constitutes a valid and enforceable contract between Edgemere and Intercity, among others.

65.     Under the NDA, Intercity made a number of promises to Edgemere, including, without limitation, to:

(a)     Hold Edgemere's Confidential Information in strict confidence and not disclose such Confidential Information to any third party except as permitted by the NDA (*see* NDA, Exh. B, § 2);

(b)     Not to use Edgemere's Confidential Information for any purpose other than a Permitted Use *and not to use the Confidential Information for any competitive purpose* (*see* NDA, Exh. B, § 3 (emphasis added));

(c)     Instruct its agents and representatives not to disclose Confidential Information to any Person without the written permission of the disclosing party providing such Confidential Information (Edgemere) (*see* NDA, Exh. B, § 2); and

(d)     Be responsible for any breach of the NDA by any of its representatives (*see* NDA, Exh. B, § 11).

66.     Intercity materially breached its obligations arising under the NDA, including, without limitation, the foregoing, by repeatedly, either directly or through its agent and representative Kong, using Edgemere's Confidential Information to compete with and destroy Edgemere's business, and by disclosing Edgemere's Confidential Information to third parties. In particular, while in possession of Edgemere's Confidential Information, which Intercity and Kong were allowed to use only for a Permitted Purpose as set forth in the NDA, Intercity and Kong:

(a)     sent the Intercity Letter (Exh. D hereto) to counsel for the Trustee, the Residents' Association, the Residents, and officials of the Texas Attorney General's Office and the Texas Department of Insurance;

(b)     communicated with DMN to initiate a negative press campaign resulting in highly negative coverage of Edgemere in DMN and other publications (*see* Exhs. E and F hereto);

(c)     engaged (and continue to engage) in direct communications with the Residents; and

(d)     used Confidential Information to evaluate and attempt to implement competitive opportunities against Edgemere, including converting the Community and Property to a different use.

67.     The foregoing actions are blatant violations of the NDA.

68.     The improper disclosures of Edgemere's Confidential Information were intended by Intercity and its representative Kong to undermine Edgemere's business so that Defendants can wrest control of the Community away from Edgemere – a devasting act of direct competition with Edgemere – and obtain the buildings and other improvements to the Property, including the Community, with no consideration to Edgemere (or the Trustee), and then convert the Community and Property to a new use that Intercity and Kong believe would result in substantially higher profits to each of them.  And along the way, Intercity and Kong would either evict the Residents from the Community or deny them refunds of the substantial Entrance Fees they previously paid. Intercity and Kong undertook these actions with a singular motivation – to capture a substantial windfall at the direct expense of Edgemere, the Residents, and the bondholders.

69.     Intercity's breaches of the NDA have damaged and continue to substantially harm and damage Edgemere and its business in an amount to be determined at trial.  Indeed, Intercity's breaches of the NDA and other misconduct substantially contributed to Edgemere having to file for chapter 11 protection on April 14, 2022.

70.     Accordingly, Edgemere sues Intercity for damages and other relief arising from Intercity's breach of the NDA.

## COUNT 2

### (Promissory Fraud Against Defendant Intercity)

71. Edgemere incorporates by reference the allegations in all preceding paragraphs as if set forth fully herein.

72. Defendant Intercity entered into the NDA with no present intent to perform.

73. Instead, on information and belief, Intercity's intent was to gain Edgemere's Confidential Information that Intercity could use to Edgemere's detriment and to destroy Edgemere's business. Among other things, Intercity gained invaluable insight into Edgemere's past and current financial performance, short and long-term financial projections, specific marketing plans and initiatives, and overall long-term strategic plans.

74. Additionally, on information and belief, Intercity entered into the Forbearance Agreement with no present intent to perform. Though Intercity's delays in responding in negotiations caused that agreement to cover only ten days in late December 2021, it was based on specifically described the parties' intent to extend the Forbearance Agreement through March 31, 2022. The Forbearance Agreement included specific milestones that extended through March 2022. Specifically, the Forbearance Agreement contemplated that Edgemere would provide a Lease restructuring term sheet by December 21, 2021, with Intercity's substantive response due 14 days later, on January 4, 2022 (days after the initial expiration). (*See* Exh. C. § II(e)(1), (2)). Likewise, the Forbearance Agreement required submission of "13-week cash budget" extending from December 10, 2021 into March 2022 (months beyond the initial expiration). (*See id*., § II(e)(1)-(6)).

75. Beyond the express terms of the Forbearance Agreement, Intercity's actions further confirm it never intended to comply with its obligations. For example, Edgemere provided the

contemplated Lease restructuring term sheet to Intercity earlier than required, on December 6, 2021. Despite its express agreement to provide a substantive written response and comments to Edgemere's term sheet, Intercity did not respond. When Edgemere inquired about Intercity's failure to respond, Intercity stated that it was not interested in restructuring the Lease.

76. After Intercity received all of the monetary and other benefits under the Forbearance Agreement, including substantial payments of rent and reimbursement of legal fees, Intercity failed and refused to provide a written response and comments to Edgemere's term sheet or otherwise negotiate in good faith regarding a Lease restructuring.

77. Edgemere relied upon Intercity's promises to abide by the terms of the NDA and Forbearance Agreement, and would not have entered into those agreements if it knew that Intercity had no intention to honor its obligations thereunder.

78. Intercity's disavowal of the NDA and Forbearance Agreement is in furtherance of its scheme to undermine Edgemere's business so that it can take the Community away from Edgemere, convert the Community to a rental community (rather than a regulated CCRC), or convert it to some other purpose altogether, in order to realize a higher value that would result from such new use, either evicting Residents from the Community or denying them credit for the substantial Entrance Fees they previously paid.

79. Intercity's fraud and misrepresentations relating to the NDA and Forbearance Agreement, and otherwise, have substantially damaged and continue to damage Edgemere and its business in an amount to be determined at trial.

80. Accordingly, Edgemere sues Intercity for damages and other relief arising from Intercity's promissory fraud of Edgemere related to the NDA and Forbearance Agreement. Indeed,

Intercity's promissory fraud, and other misconduct, substantially contributed to Edgemere having to file its Chapter 11 Case.

81.     Further, Intercity's conduct in entering into the NDA and Forbearance Agreement with no present intent to abide by those agreements' terms reflects Intercity's specific intent to cause substantial injury or harm to Edgemere.  Intercity's conduct was both malicious and fraudulent and thus justifies an award of exemplary damages against Intercity in an amount sufficient to punish Intercity and deter Intercity and others from like conduct in the future.

## COUNT 3

### (Tortious Interference With Existing Contractual and Business Relations – Against Defendants Intercity and Kong)

82.     Edgemere incorporates by reference the allegations in all preceding paragraphs as if set forth fully herein.

83.     Edgemere has valid and enforceable Residency Agreements with the Residents.

84.     By engaging in direct, improper discussions with the Residents while under the NDA with Edgemere, and by making false and malicious statements to DMN (including, without limitation, that "[i]t's unfair and unjust for Edgemere to continue to take deposits from future residents under current circumstances" when Defendants knew that Edgemere had months earlier instituted an escrow for all Entrance Fees received from new residents effective as of September 27, 2021 as expressly acknowledged in the Forbearance Agreement (Exh. C, *see* § VIII)), Defendants committed willful and intentional acts of interference with Edgemere's contractual relationships with the Residents.

85.     Defendants' actions were intended to create, and had the effect of creating, extreme fear and concern among the Residents regarding the future viability of the Community, whether the Residents would be able to continue to reside at the Community, and whether they or their

families would receive a return of any of their Entrance Fees upon the Residents leaving the Community. Because the return of any Entrance Fees to a given Resident or his/her family is contingent in part upon the Resident's unit being occupied by a new resident, the chilling effect of Defendants' misconduct on prospective sales to new residents (as described in Count 4 below) has a direct and profoundly negative impact on the Residents and their families. As a result, Edgemere has been forced to adjust (*i.e.*, lower) its financial projections provided to the Trustee in connection with the proposed postpetition financing of these Chapter 11 Cases and any restructuring and/or refinancing of the Bonds. Defendants' misconduct thus likewise interferes with Edgemere's contractual relations with the bondholders by preventing Edgemere from fulfilling its obligations under the Bonds, whether restructured or otherwise.

86.      Defendants' willful and intentional acts of interference are in furtherance of their scheme to destroy Edgemere's business, wrest control of the Community away from Edgemere, convert the Community to a different use to realize a windfall, and either evict Residents from the Community or deny them the promised return of the substantial Entrance Fees they previously paid.

87.      Defendants' tortious interference with Edgemere's existing contractual and business relationships has proximately caused substantial damages to Edgemere and its business in an amount to be determined at trial. Indeed, Defendants' tortious interference with Edgemere's existing contractual and business relationships and other misconduct substantially contributed to Edgemere having to file its Chapter 11 Case.

88.      Accordingly, Edgemere sues Defendants for damages and other relief arising from their tortious interference with Edgemere's existing contracts and business relationships.

89.     Further, Intercity's and Kong's respective actions in tortiously interfering with Edgemere's existing contracts and business relations by, among other things, disclosing Edgemere's confidential and proprietary information to DMN and the Residents, among others, reflects that each of Intercity and Kong took those actions with the specific intent to cause substantial injury or harm to Edgemere. Intercity's and Kong's individual and joint conduct was malicious and thus justifies an award of exemplary damages against Intercity in an amount sufficient to punish Intercity and Kong and deter them and others from like conduct in the future.

## COUNT 4

**(Tortious Interference With Prospective Contractual and Business Relations – Against Defendants Intercity and Kong)**

90.     Edgemere incorporates by reference the allegations in all preceding paragraphs as if set forth fully herein.

91.     There is a reasonable probability that Edgemere would, with future prospective residents of the Community, enter into life care contracts and/or residency agreements and form business relationships.

92.     By engaging in direct, improper discussions with the Residents while under the NDA with Edgemere, and by making false and malicious statements to DMN (including, without limitation, that "[i]t's unfair and unjust for Edgemere to continue to take deposits from future residents under current circumstances" when Defendants knew that Edgemere had months earlier instituted an escrow for all Entrance Fees received from new residents effective as of September 27, 2021 as expressly acknowledged in the Forbearance Agreement (Exh. C, *see* § VIII)), Defendants either acted with a conscious desire to prevent Edgemere's prospective contractual and business relations from occurring, or knew the interference was certain or substantially certain to occur as a result of their conduct.

93. As a result of Defendants' misconduct, call volume from prospective residents has dropped, tours among prospective residents have diminished, referrals of existing residents to higher levels of care within the Community are down, and individuals previously committed to joining the Community have delayed closing on their contracts. In fact, in 2021, despite the ongoing COVID-19 pandemic, Edgemere closed on contracts with new residents for 48 units, an average of four each month. In the two months since Kong and Intercity caused the first article in DMN, Edgemere has not closed any new Residency Agreements.

94. As a result of the precipitous drop in interest by prospective residents, Entrance Fee deposits and other revenue will fall substantially going forward, thus further threatening Edgemere's financial viability. In response, Edgemere has been forced to adjust (*i.e.*, lower) its financial projections provided to the Trustee in connection with the proposed postpetition financing of these Chapter 11 Cases and any restructuring and/or refinancing of the Bonds.

95. Defendants' acts of interference are independently tortious or unlawful as evidenced in part by their breaches of the NDA and other misconduct described herein.

96. Defendants' tortious interference with Edgemere's prospective contractual and business relationships has proximately caused substantial damages to Edgemere and its business in an amount to be determined at trial. Indeed, Defendants' tortious interference with Edgemere's prospective contractual and business relationships and other misconduct substantially contributed to Edgemere having to file its Chapter 11 Case.

97. Accordingly, Edgemere sues Defendants for damages and other relief arising from their tortious interference with Edgemere's prospective contracts and business relationships.

98. Further, Intercity's and Kong's respective actions in tortiously interfering with Edgemere's prospective existing contracts and business relations by, among other things,

disclosing Edgemere's confidential and proprietary information to DMN and the Residents, among others, reflects that each of Intercity and Kong took those actions with the specific intent to cause substantial injury or harm to Edgemere.  Intercity's and Kong's individual and joint conduct was malicious and thus justifies an award of exemplary damages against Intercity in an amount sufficient to punish Intercity and Kong and deter them and others from like conduct in the future.

## COUNT 5

### (Civil Conspiracy – Against Defendants Intercity and Kong)

99.     Edgemere incorporates by reference the allegations in all preceding paragraphs as if set forth fully herein.

100.    On information and belief, Intercity and Kong each has an improper object to be accomplished, consisting of their scheme to destroy Edgemere's business, wrest control of the Community away from Edgemere, convert the Community to an alternative use to realize the much higher value that would result from such new use, and either evict Residents from the Community or deny them repayment of the substantial Entrance Fees they previously paid.

101.    On information and belief, Intercity and Kong have reached a meeting of the minds on the improper object to be accomplished and a course of action in order to accomplish such improper object.

102.    Defendants' acts in furtherance of the improper object to be accomplished are independently tortious or unlawful as evidenced in part by their breaches of the NDA and other misconduct described herein.

103.    Although Kong is and has acted as agent or representative of Intercity, on information and belief, Kong is also acting for its own personal gain in connection with Defendants' improper scheme.

104.     Defendants' conspiracy and other misconduct has proximately caused substantial damages to Edgemere and its business in an amount to be determined at trial.  Indeed, Defendants' conspiracy and other misconduct substantially contributed to Edgemere having to file its Chapter 11 Case.

105.     Further, in implementing their fraudulent scheme for their individual and collective benefit, Intercity and Kong engaged in fraudulent acts and otherwise acted with specific intent to cause substantial injury or harm to Edgemere.  Intercity's and Kong's individual and joint conduct was both fraudulent and malicious and thus justifies an award of exemplary damages against Intercity in an amount sufficient to punish Intercity and Kong and deter them and others from like conduct in the future.

## COUNT 6

### (Equitable Subordination – Against Defendant Intercity)

106.     Edgemere incorporates by reference the allegations in all preceding paragraphs as if set forth fully herein.

107.     Defendant Intercity has engaged in a campaign intended to destabilize and destroy the business of Edgemere and the Community.  It has committed unlawful acts and used unlawful means, and engaged in outrageous conduct.

108.     Among other things, Intercity has engaged in substantial, ongoing inequitable conduct consisting of, among other things, breach of the NDA, promissory fraud relating to the NDA and the Forbearance Agreement, tortious interference with Edgemere's current and prospective contracts and business relations, civil conspiracy with Kong, and other misconduct described above.

109.    Intercity's willful and brazen misconduct has caused injury to Edgemere and its other creditors, and has conferred an unfair advantage on Intercity.

110.    Intercity's misconduct is substantial, involves moral turpitude, is a breach of duty and/or a misrepresentation whereby other creditors, including the bondholders, were deceived to their damage, and/or is gross misconduct amounting to fraud, overreaching or spoliation.  Indeed, Intercity's misconduct should shock the conscience of the Court.

111.    Based on Intercity's misconduct and resulting substantial damage to Edgemere and its other creditors, all existing and future claims of Intercity under the Lease should be equitably subordinated to all other allowed claims in Edgemere's bankruptcy case, including the Residents' claims and the bondholders' claims.

112.    Equitable subordination of Intercity's existing and future claims under the Lease as requested herein is consistent with the provisions of the Bankruptcy Code.

## COUNT 7

### (Reformation of Lease – Against Defendant Intercity)

113.    Edgemere incorporates by reference the allegations in all preceding paragraphs as if set forth fully herein.

114.    Except as expressly set forth below, the Lease constitutes a valid and enforceable contract between Edgemere and Defendant Intercity.

115.    When Edgemere and Intercity originally entered into the Lease, the parties knew and understood that Edgemere intended to operate the Community as a CCRC regulated by the Texas Department of Insurance.  Consistent with this knowledge and understanding, Section 5.5 of the Lease provides that Lessee (Edgemere) will use the Land only for the development, construction and ownership of the Project, generally described herein, and specifically only for

retirement housing or a senior living community. Section 5.18 of the Lease further provides in relevant part that Lessee (Edgemere) may, without the consent of Lessor and without the payment of additional rent, enter into life care contracts or sublet, rent or license residential apartments, rooms, living spaces in the Improvements and ancillary commercial uses reasonably related to the occupancy thereof, provided that the purpose of such agreement is consistent with Section 5.5 of this Lease … (*See* Lease, Exh. A, §§ 5.5, 5.18.)

116. Despite that both parties knew and understood that the Community would be operated as a regulated CCRC, where the safety, well-being, and treatment of the Residents is paramount, the parties made a mutual mistake regarding one of the other provisions of the Lease that is contrary to the foregoing provisions of the Lease and important Texas public policy interests in protecting the Residents. In particular, Section 8.2 of the Lease provides in relevant part that:

> **Remedies.** Upon the occurrence of any one or more of the Events of Default, Lessor may, at its election, subject to and conditioned upon the rights of any lender as provided in Article VII or any other provision hereof, terminate this Lease, or terminate Lessee's right to possession only, without terminating the Lease. Upon termination of the Lease, or upon any termination of the Lessee's right to possession without termination of the Lease, Lessee shall surrender possession and vacate the leased premises immediately, and deliver possession thereof to Lessor, and hereby grants to Lessor the full and free right, without demand or notice of any kind to Lessee (except as hereinabove expressly provided for), to enter into and upon the leased premises in such event, with or without process of law, and to repossess the leased premises at Lessor's former estate, *and to expel or remove Lessee and any others who may be occupying or within the leased premises*, without being deemed in any manner guilty of trespass, eviction, or forcible entry or detainer, without incurring any liability for any damage resulting therefrom, and without relinquishing Lessor's rights to rent or any other right given to Lessor hereunder or by operation of law… *** If Lessor elects to terminate Lessee's right to possession only, without terminating the Lease, the Lessor may, at Lessor's option, enter into the leased premises, remove Lessee's signs and other evidence of tenancy, and take and hold possession thereof as hereinabove provided, without such entry and possession terminating the Lease

> or releasing Lessee, in whole or in part, from Lessee's obligations to pay the rent hereunder for the full term or from any other of its obligations under this Lease, subject to the offset of all sums received by Lessor from any reletting.  ***

(*See id.*, at § 8.2 (emphasis added).)

117.    As drafted, Section 8.2 of the Lease can be read to permit Intercity upon any breach thereunder to repossess the Community and then either seek to assume the Residents' Residency Agreements despite the fact that Intercity is not a licensed CCRC operator, or seek to expel or remove the Residents despite their Residency Agreements and the substantial Entrance Fees they paid to ensure their continued residency and care at the Community.

118.    In fact, it now appears that Intercity seeks to take advantage of this provision of the Lease in an attempt to destroy Edgemere's business, wrest control of the Community away from Edgemere, convert the Community to realize the much higher value that it believes would result from such new use, and either evict the Residents from the Community or deny them credit for the substantial Entrance Fees they previously paid.

119.    That Section 8.2 purports to provide rights to Intercity that are inconsistent with the other provisions of the Lease as well as important underlying Texas public policy interests in protecting CCRC residents, which was known to the parties when they entered into the Lease, demonstrates their mutual mistake in including such rights in Section 8.2 of the Lease.

120.    As a result of the parties' mutual mistake, the Lease should be reformed to eliminate any and all provisions therein, including Section 8.2, providing Intercity any direct or indirect right to assume Edgemere's Residency Agreements with the Residents, terminate such agreements without the consent of such Residents, or otherwise evict the Residents.

121.    Additionally, and/or alternatively, if the Court finds the parties did not make a mutual mistake with respect to Section 8.2 of the Lease as set forth above, the Court should find

and declare that to the extent that Section 8.2 would permit Intercity to either seek to assume the Residents' Residency Agreements despite the fact that Intercity is not a licensed CCRC operator, or seek to expel or remove the Residents despite their Residency Agreements and the substantial Entrance Fees such Residents paid to ensure their continued residency and care at the Community, that Section 8.2 is void and unenforceable as against Texas public policy. In fact, representatives of the Texas Department of Insurance have raised concerns regarding the ability of Intercity to take possession of and operate the Community upon any default under the Lease.

**WHEREFORE**, Edgemere respectfully requests that the Court grant the following relief in favor of Edgemere:

A.      Judgment against Defendant Intercity for breach of the NDA under Count 1;

B.      Judgment against Defendant Intercity for promissory fraud relating to the NDA and Forbearance Agreement under Count 2;

C.      Judgment against Defendants Intercity and Kong for tortious interference with Edgemere's current contracts and business relations under Count 3;

D.      Judgment against Defendants Intercity and Kong for tortious interference with Edgemere's prospective contracts and business relations under Count 4;

E.      Judgment against Defendants Intercity and Kong for civil conspiracy under Count 5;

F.      Judgment against Defendant Intercity for equitable subordination of all of Intercity's existing and future claims against Edgemere under the Lease to all other allowed claims in Edgemere's bankruptcy case under Count 6;

83065846.1

G. Judgment against Defendant Intercity for reformation of the Lease and/or for a declaration regarding the invalidity and unenforceability of portions of Section 8.2 of the Lease as against Texas public policy under Count 7;

H. An award of monetary damages, including compensatory damages, in an amount to be determined at trial, under Counts 1-5;

I. An award of exemplary damages, including punitive damages, in an amount to be determined at trial, under Counts 2-5;

J. An award of Edgemere's reasonable attorney's fees and costs;

K. An award of prejudgment interest and post-judgment interest on the monetary damages awarded under Counts 1-5 as provided by law; and

L. Such other and further legal and equitable relief as may be just and proper.

Dated: April 14, 2022
Dallas, Texas

**POLSINELLI PC**

/s/ *Trinitee G. Green*
Trinitee G. Green (SBN 24081320)
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Facsimile: (214) 397-0033
tggreen@polsinelli.com

Jeremy R. Johnson (*Pro Hac Vice* Pending)
Brenna A. Dolphin (*Pro Hac Vice* Pending)
600 3rd Avenue, 42nd Floor
New York, New York 10016
Telephone: (212) 684-0199
Facsimile: (212) 684-0197
jeremy.johnson@polsinelli.com
bdolphin@polsinelli.com

Jerry L. Switzer, Jr. (*Pro Hac Vice* Pending)
150 N. Riverside Plaza, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 819-1900
Facsimile: (312) 819-1910
jswitzer@polsinelli.com

Thomas Kokoruda (*Pro Hac Vice* Pending)
Andrew J. Ennis (*Pro Hac Vice* Pending)
900 West 48th Place, Suite 900
Kansas City, Missouri 64112
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
tkokoruda@polsinelli.com
aennis@polsinelli.com

PROPOSED COUNSEL TO THE
DEBTORS
AND DEBTORS IN POSSESSION

83065846.1