

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 6, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **NORTHWEST SENIOR** | § | Case No. 22-30659 |
| **HOUSING CORPORATION** | § | |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| **NORTHWEST SENIOR** | § | |
| **HOUSING CORPORATION,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Pro. No. 22-03040 |
| | § | |
| **INTERCITY INVESTMENT** | § | |
| **PROPERTIES, INC. AND KONG** | § | |
| **CAPITAL, LLC,** | § | |
| | § | |
| Defendants. | | |

## ORDER REGARDING COURT'S *IN CAMERA* REVIEW OF
## CERTAIN DOCUMENTS IN CONNECTION WITH PLAINTIFF
## AND DEFENDANTS' MOTIONS TO COMPEL PRODUCTION

1

This Order addresses a discovery dispute in the above-captioned adversary proceeding (the "**Adversary Proceeding**") that Northwest Senior Housing Corporation (the "**Plaintiff**" or "**Debtor**") has brought against Intercity Investment Properties, Inc. ("**Intercity**") and Kong Capital, LLC ("**Kong**") (collectively, the "**Defendants**"). On August 23, 2022, the Plaintiff filed its *Motion to Compel Defendants to Respond to Discovery Requests* ("**Plaintiff's Motion to Compel**").[1] On August 26, 2022, the Defendants filed their *Motion to Compel Discovery Compliance from Plaintiff* ("**Defendants' Motion to Compel Plaintiff**")[2] and *Brief in Support*.[3] On the same day, the Defendants filed their *Motion to Compel Discovery Compliance from UMB Bank, N.A.* (the "**Defendants' Motion to Compel UMB**")[4] and *Brief in Support*.[5] All three motions to compel were subsequently objected to by the parties subject to each respective motion.[6]

On September 12, 2022, the Court held a hearing on the motions to compel. Finding the issues underlying the motions not yet ripe for ruling or sufficiently narrowed for *in camera* review, the Court advised the parties to continue to work toward resolving the underlying disputes and therefore did not immediately rule on the motions. Subsequently, the Court thereafter held multiple status conferences regarding the parties' efforts.[7] Despite narrowing the disputes, the parties were unable to resolve all underlying issues in the motions and agreed to provide a sampling to the Court of the various productions for *in camera* review. The Court took the motions under advisement, and the parties subsequently provided the Court with a sampling of their productions. During the pendency of the Court's *in camera* review, the Plaintiff filed under seal its *Motion for Leave to*

---

[1] Dkt. No. 98.
[2] Dkt. No. 106.
[3] Dkt. No. 107.
[4] Dkt. No. 109.
[5] Dkt. No. 110.
[6] Dkt. Nos. 119–120, 132–133.
[7] The Court held these status conferences on September 21, September 29, and October 6, 2022.

*Supplement the Record on its Motion to Compel* (the "**Motion to Supplement**")[8] requesting the Court allow the Plaintiff to supplement the Court's review of the Plaintiff's Motion with certain documents. On October 26, 2022, the Court held a hearing on the Motion to Supplement. No parties objected to the relief requested, and the Court granted supplementation of the record.[9]

After considering the briefing, oral arguments of counsel, and *in camera* review of documents provided, the Court concludes that the motions to compel should be **GRANTED, in part, and DENIED, in part,** as set more fully herein. The following constitutes the Court's analysis.

## I.     Relevant Background.

The Debtor filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code on April 14, 2022.[10] On the same day, the Debtor filed its adversary Complaint alleging certain causes of action against Intercity, the Debtor's landlord under a lease of the property entered into in November of 1999 (the "**Ground Lease**"), and Kong, the alleged agent, business partner, and/or consulting expert of Intercity.[11] The Plaintiff alleged seven (7) causes of action against Intercity and/or Kong, including:

(1) Breach of Contract (NDA) against Intercity;

(2) Promissory Fraud against Intercity;

(3) Tortious Interference with Existing Contractual and Business Relations against both Defendants;

(4) Tortious Interference with Prospective Contractual and Business Relations against both Defendants;

---

[8] Dkt. No. 196.
[9] Dkt. No. 218.
[10] Voluntary Petition for Non-Individuals Filing for Bankruptcy, Case No. 22-30659-MVL, Dkt. No. 1 (Bankr. N.D. Tex. 2022).
[11] Dkt. No. 1.

(5) Civil Conspiracy against both Defendants;

(6) Equitable Subordination against Intercity; and

(7) Reformation of the Lease against Intercity.[12]

The Plaintiff subsequently withdrew its cause of action for tortious interference with existing contractual and business relations,[13] and the Court dismissed the Plaintiff's cause of action for tortious interference with prospective contractual and business relations without prejudice to repleading.[14]

Central to the instant Motions to Compel are certain essential facts. First, Intercity engaged Kong under a consulting services agreement (the "**Consulting Agreement**") dated December 13, 2021.[15] It appears, based on the representations of counsel at the status conferences on the instant motions, that communications between Intercity and Kong prior to the entry of the Consulting Agreement have been produced.[16] Second, in January 2022, Intercity chose to change its counsel and employed Levenfeld Pearlstein, LLC ("**LP**"), the Defendants' current lead legal counsel in this case.[17] LP adopted the Consulting Agreement and chose to include Kong in the control group.[18] Third, on February 22, 2022, LP sent correspondence (the "**Intercity Letter**") to

---

[12] *See id.*

[13] Dkt. No. 58 at 23–24.

[14] Dkt. No. 99 at 12–15.

[15] Defs.' Ex. 8 (Consulting Agreement between ICI and Kong dated Dec. 13, 2021). The Defendants, by their argument and pleadings, used a date of December 14, 2021 for the Consulting Agreement. *See, e.g.*, Dkt. No. 120 at 8 ("ICI thus engaged Kong under the terms of a letter agreement for consulting services dated December 14, 2021[.]"). However, the Consulting Agreement produced provides for the earlier date. Defs.' Ex. 8. The December 14, 2021, date appears to come from another version of the agreement, also signed, with added "in anticipation of litigation" language. Defs.' Ex. 9-B. This version was produced as an exhibit to LP's supplement to its engagement letter, dated January 11, 2022. *Id.* For purposes of the assertion of privilege, the Court has chosen December 13, 2021, the date of the original Consulting Agreement, as the operative date. *See* Defs.' Ex. 8.

[16] The Defendants had previously not produced these documents, but it is the Court's understanding that they have since been produced and are not subject to the Court's instant ruling.

[17] Pl.'s Ex. "R" (supplement to engagement letter dated Jan. 10, 2022 and engagement letter dated Jan. 7, 2022); Dkt. No. 120 at 9. There has been no assertion that either LP or Jackson Walker LLP represented Kong prior to the adversary case, though they did begin representing both Defendants once the adversary was filed. Dkt. No. 98 at 7 n.8.

[18] Pl.'s Ex. "R" (supplement to engagement letter dated Jan. 10, 2022); Defs.' Ex. 9 (same).

Edgemere representatives and Lifespace Communities, Inc. ("**Lifespace**"), as well as their respective counsel, counsel to UMB Bank, N.A. ("**UMB**"), the Texas Attorney General's Office, the Texas Department of Insurance, and the Edgemere Residents' Association.[19] Therein, Intercity informed the various constituencies of its concerns regarding the Edgemere property, explaining that rent had not been timely paid and that the Ground Lease would terminate the following month.[20] Notably, Intercity informed the parties that it had engaged Kong as a "go-forward solution" for the residents to "convert the building from a CCRC into a senior living rental facility."[21] Fourth, the Debtors and UMB responded to the Intercity Letter almost immediately, threatening litigation based on perceived disclosures of confidential information in violation of a non-disclosure agreement between the parties entered into in connection with a forbearance agreement.[22] Less than two months later, on April 14, 2022, the Debtors filed the Chapter 11 cases and commenced the Adversary Proceeding.[23]

## II.    Analysis.

As a preliminary note, the Court understands that production in this case is ongoing and that certain documents at issue in these Motions to Compel have been mooted by such production. The Court only intends to rule on the distinct legal questions presented as live at the most recent substantive status conference on the motions held on October 6, 2022. Those legal questions are: (1) whether Kong was a consulting expert of Intercity; (2) whether Kong and Intercity share a common interest privilege; (3) whether certain communications with Kong are protected by the

---

[19] Dkt. No. 98 (Ex. 6).

[20] *See id.*

[21] *Id.*

[22] *See* Defs.' Ex. 10 (February 23, 2022 letter from Sidley Austin LLP to LP); Dkt. No. 120 at 10 ("[C]ounsel for both the Debtors and UMB sent vitriolic responses to the Stakeholder Notice Letter, asserting a breach of the NDA and placing blame on ICI, while still failing to outline a plan for resolution of the pending Lease defaults.").

[23] *See* Dkt. No. 1; Voluntary Petition for Non-Individuals Filing for Bankruptcy, Case No. 22-30659-MVL, Dkt. No. 1 (Bankr. N.D. Tex. 2022).

attorney-client privilege; and (4) whether a common interest privilege exists between UMB, Lifespace, and the Plaintiff.[24] The following shall constitute the Court's rulings thereon:

### A. Kong and the Consulting Expert Privilege

The Defendants failed to meet their burden of demonstrating that Kong was a consulting expert retained in anticipation of litigation. The Defendants claim that Kong was a consulting expert retained in anticipation of litigation to provide its expert opinion as to certain impending issues, including: the accuracy and significance of the Edgemere's financials; the feasibility of a restructuring; the viability of any bankruptcy plan the Debtor would provide as part of a Chapter 11 case, and ICI's potential objections to a bankruptcy plan.[25] The Defendants point the Court to the Consulting Agreement, which explicitly notes that Kong had been engaged in anticipation of litigation.[26] The Plaintiff claims that Kong was not retained for litigation purposes; instead, the Plaintiff asserts that Kong was retained for a purely business purpose: transitioning the Edgemere to a rental-based community and maximizing the profitability of Intercity's interest in the property.[27] Additionally, the Plaintiff argues that the consulting expert privilege should not be extended to Kong since it was an actor in the factual circumstances underlying the present lawsuit.[28] The Court finds that the Defendants have failed to meet their burden of proving that Kong was engaged for anything other than the business purpose asserted by the Plaintiff. As such, the Court finds that Kong was not a consulting expert and orders production of the underlying communications.

---

[24] Based on the Court's understanding at the most recent status conference, the issue of whether some privilege (consulting expert) existed regarding FTI Consulting is *not* live. The Court's ruling does not reach that question.
[25] Dkt. No. 120 at 17–18.
[26] *See id.* at 8; Defs.' Ex. 9-B (Consulting Agreement dated December 14, 2021).
[27] Dkt. No. 93 at 13.
[28] *Id.* at 14–15.

The party resisting discovery has the burden to prove that the asserted privilege applies.[29] The consulting expert privilege stems from Rule 26 of the Federal Rules of Civil Procedure (the "**Federal Rules**"), made applicable to this Adversary Proceeding by Rule 7026 of the Federal Rules of Bankruptcy Procedure, which makes clear that a party ordinarily cannot discover consulting expert work product, defined as that of "an expert who has been retained or specially employed by another party *in anticipation of litigation* or to prepare for trial and who is not expected to be called as a witness at trial."[30] The Fifth Circuit has interpreted "anticipation of litigation" to mean the party had reason to anticipate litigation and "the primary motivating purpose behind the creation of the document was to aid in possible future litigation."[31]

The Court finds that Kong is not a consulting expert as it was not retained in anticipation *of litigation*. First, as a preliminary note, the Court notes that Intercity opted to *not* have a Kong or Intercity representative testify. This choice severely handicapped the Court's fact finding, particularly in light of the recognition that Kong and Intercity contemplated, from time to time, two distinct roles for Kong. For example, there was no testimony about how often Kong had worked as a litigation consultant, about its role in prior cases, or any other testimony regarding its qualifications and expertise. These are questions that the Court would have expected answered by any party seeking to assert the consulting expert privilege, let alone one that found itself a named defendant in an adversary proceeding. Yet, the limited evidence presented to the Court reflected

---

[29] *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985); *see also see also Mims v. Dallas County*, 230 F.R.D. 479, 484 (N.D. Tex. 2005) ("The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial.").
[30] Fed. R. Civ. P. 26(b)(4)(D) (emphasis added).
[31] *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000); *see also Mims*, 230 F.R.D. at 483 ("A document need not be generated in the course of an ongoing lawsuit in order to qualify for work product protection. However, 'the primary motivating purpose' behind the creation of the document *must* be to aid in possible future litigation.") (emphasis added).

something much more akin to a business partnership or joint venture, rather than a litigant-expert relationship.[32]

The Defendants failed to meet their burden to show that the primary motivating purpose behind Kong's engagement was for *anything* more than the *business purpose* of transitioning the Edgemere into an alternative business model, if and when Intercity took control of the property. Notably, by Intercity's own admission, it was Kong who reached out initially to Intercity, which is certainly atypical of a litigant-expert relationship.[33] It appears that Kong, an "active participant in the senior living industry, with experience in both strategic investments as well as active management and operations" became aware of the Edgemere through the Office of Attorney General and took it upon itself to review the Edgemere's financials on the Electronic Municipal Market Access ("**EMMA**") system and reach out to Intercity as landlord.[34] It was only then that a partnership was formed between the parties. Did the parties enter into a consulting agreement? Yes, they did.  But it should be noted that the first *signed* draft of the Agreement, dated December 13, 2021, prior to LP's retention, said nothing of "anticipation of litigation."[35] That language only appeared subsequently, produced in connection with LP's engagement as an exhibit to a January 10, 2022 engagement letter addendum.[36] In fact, the only notable difference between the consulting agreement dated December 13, 2021, and the consulting agreement dated December 14, 2021, is that "in anticipation of litigation" language was added.[37] Frankly, the addition of "in anticipation of litigation" language to the engagement letter appears more likely thoughtful creative lawyering,

---

[32] *See e.g.*, Pl.'s Ex. "T" (Letter of Intent draft).
[33] Dkt. No. 120 at 8 ("Kong approached ICI in November 2021 to offer its expertise in the senior living industry and to consult with ICI in connection with the anticipated bankruptcy.").
[34] *Id.*
[35] *Compare* Defs.' Ex. 8 (Consulting Agreement dated December 13, 2021) *with* Defs.' Ex. 9-B (Consulting Agreement dated December 14, 2021).
[36] Defs.' Ex. 9.
[37] *Compare* Defs.' Ex. 8 (Consulting Agreement dated December 13, 2021) *with* Defs.' Ex. 9-B (Consulting Agreement dated December 14, 2021).

but does nothing to show the Court *factually* that Kong was anything other than the entity Intercity chose to couple with to gain back the property or gameplan in the chance that an opportunity to terminate the Ground Lease arose. It is akin to a consultant that goes into the market to find a business partner, operator, or financier. The evidence clearly reflects that Kong was to serve in one or more of those roles, not as a consultant retained in anticipation of litigation. Defendants' counsel conceded at the hearing (and the evidence substantiates) that there were discussions of a relationship more akin to a joint venture before the "pivot" to the Consulting Agreement.[38] However, correspondence subsequent to the execution of the Consulting Agreement belies that any true "pivot" took place.[39]

Further, without even considering private communications, the Defendants are somewhat hamstrung by their own public words. The Intercity Letter itself, dated February 22, 2022, puts forth that Intercity had retained Kong to assist in converting the retirement community to a rental-based community.[40] Intercity retained Kong to maximize the profitability of its interest in the Ground Lease, plain and simple. The Court sees this as undeniably nothing more than a business purpose. Any communications currently being withheld by the Defendants would go to that business purpose. Accordingly, because the Defendants have failed to establish that Kong was a consulting expert retained in anticipation of litigation, the consulting expert privilege is not applicable.

In the alternative, even if the Court were to find that Kong was a consulting expert, the Court finds that exceptional circumstances exist that warrant production pursuant to Federal Rule

---

[38] *See, e.g.*, Pl.'s Ex. "V" (Feb. 11, 2022 email exchange between Kong and ICI representatives).

[39] By one correspondence, for example, a Kong representative refers to Kong as the future lessee, rather than the Debtors. *See id.* (email between Kong and ICI dated February 11, 2022). Likewise, even the fee under the Consulting Agreement is identical to the $250,000.00 fee described in an ICI draft of a Letter of Intent to be paid only if Kong was successful in taking possession of the Edgemere property. Pl.'s Ex. "T" (Letter of Intent draft).

[40] Dkt. No. 98 (Ex. 6) ("ICI has determined that its expert industry consultant, Kong Capital LLC, has the necessary expertise and personnel to convert the building from a CCRC into a senior living rental facility.").

26(b)(4)(D)(ii). Under the Federal Rules, documents and communications protected under the consulting expert privilege may be discovered upon "showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means."[41] It is a high burden, which has been interpreted in practice to mean showing an inability to obtain equivalent information from other sources.[42]

As already stated, the Defendants failed to meet their burden of proving that Kong was a consulting expert retained in anticipation of litigation. However, even if the Defendants had met that burden, exceptional circumstances in this Adversary Proceeding warrant production. Kong is a named defendant in this Adversary Proceeding. It is undeniable that Kong had its "hands" in all facts related to this case. Without taking any position on the viability of any causes of action, Kong had a distinct role in the factual allegations related to the Plaintiff's cause of action for breach of the NDA, the Intercity Letter, and the retention of Monument as a public relations firm to facilitate conversations with the Dallas Morning News ("**DMN**").[43] All relevant facts in this case appear to run through and around Kong.[44] Kong was not just a mere observer, but an active participant in the events preceding the bankruptcy cases and the Adversary Proceeding.[45] The Advisory Committee Notes to Federal Rule 26(b)(4) clarify that the rule "does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit,"

---

[41] Fed. R. Civ. P. 26(b)(4)(D)(ii).

[42] *See Mercury Luggage Manufacturing Company v. Domain Protection, LLC*, No. 3:19-CV-1939-M-BN, 2022 WL 171295, at *2 (N.D. Tex. Jan. 19, 2022).

[43] Defendant's Ex. 10 (Feb. 23, 2022 letter from Sidley Austin to LP alleging breaches of the NDA by both ICI and Kong, including Kong's communications with a reporter of the DMN).

[44] *See also In re Taxotere (Docetaxel) Products Liab. Litig.*, No. MDL 16-2740, 2018 WL 5669019, at *3 (E.D. La. Nov. 1, 2018) (noting the Rule 26(b)(4) does not address information obtained because the individual was an actor or viewer of the circumstances surrounding the lawsuit).

[45] *Id.* at *4.

in which case, "[s]uch an expert should be treated as an ordinary witness."[46]  As one court aptly put, "A person is not a consulting expert if he is an actor with regard to the occurrences from which the tapestry of the lawsuit was woven, whose opinion about causation is premised on personal knowledge and observations made in the course of treatment. An expert whose opinion testimony arises not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation is not a consulting expert."[47] It would be difficult, *if not impossible*, for the Plaintiff to adequately discover "motive" without such discovery,[48] a crucial aspect of the Plaintiff's case.[49] As such, even if the Court had found that Kong was a consulting expert, the Plaintiff has established exceptional circumstances that would warrant production pursuant to Federal Rule 26(b)(4)(D)(ii).

In sum, the Defendants failed to meet their burden of establishing that Kong was retained in anticipation of litigation, and as such, the Court finds that Kong was not a consulting expert. Even if the Defendants had met their burden, the Court finds exceptional circumstances warrant production. Accordingly, the Defendants are ordered to produce the related discovery absent applicability of a separate privilege or confidentiality assertion.

### B.  Common Interest Privilege Between Kong and Intercity

---

[46] Fed. R. Civ. P. 26 advisory committee's note.

[47] *Taxotere*, 2018 WL 5669019, at *4 (internal quotations omitted).

[48] *Compare Pride Centric Resources, Inc. v. LaPorte*, Civ. Action No. 19-10163, 2020 WL 13608067, at *4 (E.D. La. Nov. 10, 2020) (failure to find exceptional circumstances warranting production when movant had ability to review financial records itself through own expert), and *Galley v. ZOLL Medical Corporation*, 2:18-CV-223-BR, 2019 WL 13193899, at *4 (N.D. Tex. May 21. 2019) (failure to find exceptional circumstances warranting production when movant only provided "speculative" arguments that evidence had been lost or destroyed), *with Willis v. Cent. Mut. Ins. Co.*, No. 08-127, 2009 WL 1787679, at *3–4 (W.D. La. June 17, 2009) (finding exceptional circumstances warranting production when expert's raw data was necessary for interpretation of later tests).

[49] Dkt. No. 1 at 20–22 (asserting promissory fraud cause of action against Intercity); *see also* Dkt. No. 99 at 9–12 (Court's order denying the Defendants' Motion to Dismiss as to Plaintiff's promissory fraud cause of action against Intercity).

The Court finds that the common legal interest privilege applies between Kong and Intercity from February 23, 2022 until April 14, 2022. The Plaintiff asserts that Kong and Intercity had no common interest for which their communications could be privileged; rather, the Plaintiff asserts that the Defendants had nothing more than a "rooting" interest insufficient to trigger the privilege.[50] The Defendants, however, assert that the privilege protects communications and documents from February 23, 2022 until the filing of the Adversary Proceeding on April 14, 2022.[51] During this period, the Defendants assert that they had identical interests, and that they were on notice that litigation was imminent.[52] The Court is persuaded that a palpable threat of litigation existed as of February 23, 2022. Accordingly, the Court finds the common interest privilege applies from that date until the filing of the Adversary Proceeding, *so long as* such communications were made in furtherance of a joint defense.

The common interest or common legal interest privilege, an extension of the attorney-client privilege, has been recognized by the Fifth Circuit but applies narrowly to two types of communications: (1) communications between co-defendants in actual litigation and their counsel; and (2) communications between potential co-defendants and their counsel.[53] For the privilege to apply to potential co-defendants and their counsel, there must be a "*palpable threat of litigation* at the time of the communication, rather than a mere awareness that one's questionable conduct might some day result in litigation[.]"[54] The privilege must be narrowly construed to those parties and

---

[50] Dkt. No. 98 at 10–11.
[51] Dkt. No. 120 at 23.
[52] *Id.*
[53] *In re Sante Fe Intern. Corp.*, 272 F.3d 705, 710 (5th Cir. 2001); *see also BCR Safeguard Holdings, L.L.C. v. Morgan Stanley Real Estate Advisor, Inc.*, 614 Fed. App'x 690, 703 (5th Cir. 2015).
[54] *Santa Fe*, 272 F.3d at 711 (emphasis added).

their counsel that share a common interest.[55] A shared business interest or rooting interest is insufficient to trigger the privilege.[56]

In the present case, the Plaintiff asserts that any interest shared between the Defendants was a merely a business interest. The Plaintiff points the Court to the Intercity Letter, which sets forth that Kong had been retained by Intercity to "convert the building from a CCRC into a senior living facility."[57] To the Plaintiff, this shows there was nothing more than a shared commercial interest, not a litigation interest subject to the privilege.[58] However, the Defendants do not assert that the common interest privilege applies until *after* the receipt of the Intercity Letter. Specifically, the Defendants claim that, in response to the Intercity Letter, former counsel for the Debtors threatened litigation against both Kong and Intercity.[59] At this time, February 23, 2022, Intercity and Kong claim the common interest privilege was triggered as they were now on notice of an impending lawsuit.[60]

The Court is persuaded by the Defendants' argument on this point. First, it is without question that on February 23, 2022, both Intercity and Kong had been put on notice of a palpable threat of litigation. Counsel for the Edgemere undeniably threatened lawsuits against both Intercity

---

[55] *See Nieman v. Hale*, Case No. 3:12-CV-2433-L-BN, 2013 WL 6814789, at *2 (N.D. Tex. Dec. 26, 2013); *see also Santa Fe*, 272 F.3d at 710 ("With respect to [potential co-defendants and their counsel], the term 'potential' has not been clearly defined. However, because the privilege is 'an obstacle to truthseeking,' it must 'be construed narrowly to effectuate necessary consultation between legal advisers and clients.'") (citing *In re LTV Sec. Litig.*, 89 F.R.D. 595, 606 (N.D. Tex. 1981)).

[56] *See Tonti Mgmt. Co. v. Soggy Doggie, LLC*, No. CV 19-13134, 2020 WL 9172077, at *4 (E.D. La. June 25, 2020) (citing Santa Fe, 272 F.3d at 713); *United States v. Ocwen Loan Servicing, LLC*, No. 4:12-CV-543, 2016 WL 1031157, at *6 (E.D. Tex. Mar. 15, 2016).

[57] Dkt. No. 98 (Ex. 6).

[58] *Id.* at 10 ("[T]he requested communications among Kong, Intercity, and either party's attorneys must be produced because communications among Kong, Intercity, and either party's attorneys concerning their shared business interests do not constitute a common legal interest sufficient to warrant application of the CLI privilege.").

[59] Dkt. No. 120 at 24 ("The start date of the 'palpable threat of litigation' against both Kong and ICI as codefendants is clearly established. On February 23, 2022, in response to the Resident Letter, counsel for Plaintiff sent a letter to counsel for Defendants accusing both Kong and ICI of numerous breaches of contract.").

[60] *See id.*

and Kong in response to the Intercity Letter,[61] and, in fact, followed through on these threats by

filing the Adversary Proceeding on April 14, 2022.[62] The Complaint in this case contains a cause

of action for breach of the non-disclosure agreement between the parties, specifically alleging that

sending the Intercity Letter was a breach.[63] Second, the Court's review of the documents *in camera*

establishes that the relationship between Kong and Intercity during the time period in question had

somewhat altered. Though it admittedly appears that the relationship was *initially* formed for the

commercial purpose of transitioning the Edgemere property, the receipt of the letter from

Edgemere's counsel effectively put both parties in fear of impending litigation.[64] Of course, the

Court readily concedes that there was no joint defense agreement between Kong and Intercity.

However, this absence in not dispositive in finding whether the privilege is triggered.[65]

Accordingly, the Court finds that the common interest privilege applies from February 23,

2022 until the filing of the Adversary Proceeding to all communications ***in furtherance of the***

***defense of future litigation***.[66] The Court, as required by Fifth Circuit precedent, interprets the

privilege narrowly only to extend this privilege to those documents or communications related to

the threat of litigation by the Edgemere's counsel. Any communications related to the now

---

[61] Defendant's Ex. 10 (Feb. 23, 2022 letter from Sidley Austin to LP alleging breaches of the NDA by both ICI *and* Kong); *see also* Defendant's Ex. 11 (Feb. 24, 2022 letter from Sidley Austin to LP).

[62] Dkt. No. 1.

[63] *Id.* at 18 (citing the Intercity Letter as one of the disclosures of confidential information in breach of the NDA).

[64] Dkt. No. 120 at 24 ("Directly accusing Kong and ICI of these violations creates a palpable anticipation of litigation that similarly placed both Defendants on shared ground to defend against those allegations.").

[65] *See, e.g.*, *Santa Fe*, 272 F.3d at 709 n.5 ("The defendants did nothing to show that the communications to third persons were made in anticipation of a common defense. On the contrary, the age of the communications, the lack of evidence of any common defense agreement, and Santa Fe's answers to plaintiffs' requests for admissions made a strong case against the common interest privilege claim."); *Vacco v. Harrah's Operating Co.*, No. 1:07-CV-0663, 2008 U.S. Dist. LEXIS 88158, at *27 (N.D.N.Y. Oct. 29, 2008) ("[I]t is *not necessary* that a formal written common interest agreement have been entered into in order to invoke the common interest privilege; it is enough that there is an oral understanding between the parties toward mutual cooperation.") (emphasis added).

[66] *See In re Harwood P-G, Inc.*, 403 B.R. 445, 460 (Bankr. W.D. Tex. 2009) ("[B]ecause the Fifth Circuit requires (at least) pending litigation for the common interest doctrine to apply, the application of the common interest doctrine is likely *limited to encouraging open communications to assist the lawyer in providing legal advice in the face of pending or existing litigation*.") (emphasis added).

"busted" consulting expert purpose—transitioning the property, marketing, etc.—during this period should be produced.

### C. Attorney-Client Privilege

The Defendants assert that the attorney-client privilege protects communications between ICI, Kong, and counsel from discovery, for the period beginning January 7, 2022, the date of LP's engagement, until the present. The Defendants specifically claim they made Kong part of their "control group," and as such, all communications were privileged from the onset of the engagement.[67] The Plaintiff, however, claims that this broad, sweeping assertion of the attorney-client privilege is inappropriate as the doctrine does not apply to protect communications with a purely business purpose or communications that do not reflect legal counsel's advice or mental impression for the purpose of furthering legal representation.[68] As a limiting note to this issue, the Court notes that it has already found that the common legal interest privilege, merely an extension of the attorney-client privilege, applies to communications between Intercity and Kong from February 23, 2022, until the present, so long as they were made in furtherance of a palpable threat of litigation.[69] Thus, the question before the Court is only whether the attorney-client privilege extends backwards from February 23, 2022 to LP's engagement and Intercity's placement of Kong in the "control group."[70] The Court finds it does not.

The attorney-client privilege applies to communications, if it can be shown that: (1) the communication was confidential; (2) made to a lawyer or his subordinate; and (3) for the primary purpose of securing either legal opinion or legal services, or assistance in a legal proceeding.[71] The

---

[67] Dkt. No. 120 at 9 ("ICI asked LP to include Kong within the control group of client representatives who would be involved in attorney-client privileged communications with respect to such anticipated litigation.").

[68] Dkt. No. 98 at 6.

[69] *Santa Fe*, 272 F.3d at 710.

[70] *See* Dkt. No. 120 at 12 (chart demonstrating the Defendants' blanket assertions of overlapping privileges).

[71] *Jolivet v. Compass Group USA, Inc.*, 340 F.R.D. 7, 19 (N.D. Tex. 2021) (citing *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)).

burden of proof is on the privilege claimant.[72] Determining the applicability of the privilege is a

highly fact-specific inquiry by the Court.[73] Because the effect of the attorney-client privilege is to

restrict or withhold relevant information from the fact-finder, it has been interpreted narrowly by

the Fifth Circuit where only necessary to achieve its purpose.[74]

Here, the Defendants' principal argument as to attorney-client privilege was that LP placed

Kong in the control group after LP's engagement and therefore the communications fall within the

privilege.[75] Admittedly, as noted by the Defendants, the Fifth Circuit applies the subject matter

test in the context of attorney-client privilege in regard to corporate clients.[76] Under this test,

communications between counsel and a client's employee or its control group are privileged. Yet,

the Defendants ignore the pertinent question of whether the *primary purpose* of the

communications was for legal opinion or legal services.[77] Here, for many of the reasons already

stated, the Court finds it was not.

Frankly, after *in camera* review, the Court was not persuaded by the evidence presented

that the Defendants' primary purpose underlying the communications was anything more than a

business purpose. It was the Defendants' burden to show how the attorney-client privilege

applied,[78] but as already discussed in relation to the discussion of the consulting expert privilege,

the evidence shows that Intercity retained Kong to maximize the profitability of its interest in the

---

[72] *King v. Healthcare System, L.C.*, 645 F.3d 714, 720–21 (5th Cir. 2011); *Santa Fe*, 272 F.3d at 710.
[73] *King*, 645 F.3d at 721; *Jolivet*, 340 F.R.D. at 20–21.
[74] *Santa Fe*, 272 F.3d at 710.
[75] Dkt. No. 120 at 9. The Defendants, citing to *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994), also argue that Kong was the functional equivalent of an employee and thus should be protected under the subject matter test. Dkt. No. 120 at 18. However, upon review of the exhibits and the production *in camera*, it is clear to the Court that Kong was *not* the functional equivalent of an employee so as to be protected from production. The Defendants set out to form a lessor-lessee relationship, not an employer-employee relationship. Pl.'s Ex. "V". Additionally, it is clear that Kong did not take orders from Intercity, nor were such orders given. Rather, the relationship resembles that of a joint venture. *See e.g.*, Pl.'s Ex. "T" (Letter of Intent draft).
[76] *See In re Avantel*, 343 F.3d 311, 321 (5th Cir. 2003).
[77] *See Slocum v. Int'l Paper Co.*, 549 F.Supp.3d 519, 524 (E.D. La. 2021).
[78] *King*, 645 F.3d at 720–21; *Santa Fe*, 272 F.3d at 710.

Ground Lease. Kong itself reached out to Intercity initially in regard to this commercial interest.[79] The services contemplated, as evidenced by the Intercity Letter itself, were specifically for transitioning the property and setting up a go-forward solution for the Edgemere community.[80] During this time period, after LP's engagement and prior to the threat of litigation made by then-counsel for the Debtors, the Court is not persuaded as to how any communications with Kong, *a real estate private equity firm*, were for the *primary* purpose of legal services. The Court will not extend the attorney-client privilege, a privilege meant to be narrowly tailored under Fifth Circuit precedent,[81] to a party engaged for business purposes, particularly in the face of such little evidence to the contrary.[82]

Accordingly, for the reasons herein, the Court finds the Defendants have failed to meet their burden of establishing the attorney-client privilege extends to Kong during the period after LP's engagement up to February 23, 2022. Accordingly, these documents and communications must be produced.

### D.  Common Interest Privilege Between Lifespace, UMB and the Debtors

Lifespace, UMB, and the Debtors have failed to meet their burden to establish that the common interest privilege applies to shield production of certain documents related to their preparation for a potential Chapter 11 filing.[83] The Plaintiff and UMB separately assert that a common interest arose between the parties as early as September 1, 2021 in relation to their

---

[79] Dkt. No. 120 at 8.

[80] Dkt. No. 98 (Ex. 6).

[81] *Santa Fe*, 272 F.3d at 710.

[82] The Defendants also did not argue or present caselaw establishing that a false belief that communications are privileged, specifically as to a party within a "control group", somehow serves to protect these communications, nor does the Court believe it so.

[83] The Plaintiff, in the Court's understanding, does not assert common interest privilege as to certain documents unrelated to the restructuring and has produced these documents to the Defendants. To the extent such documents have not yet been produced, they are hereby ordered to be produced.

preparation for the instant bankruptcy and the Adversary Proceeding.[84] Thus, they claim that

documents and communications related to this strategy are privileged. In response, the Defendants

assert that no such common interest privilege existed between the parties.[85] The Defendants claim

that no unity of interest existed between the parties, that the privilege cannot attach to a nonparty,

and that there was no palpable threat of litigation.[86] For the reasons following, the Court finds no

privilege applies to communications between UMB and Plaintiff or UMB and Lifespace and orders

production.

As stated above, communications between potential co-defendants and their counsel can

be protected by the common interest privilege so long as there has been a "palpable threat of

litigation at the time of the communication[.]"[87] For the purposes of the common interest privilege,

a possible restructuring is "litigation,"[88] particularly in the sense of weighing the competing rights

of the debtor against the rights of unsecured creditors.[89] Further, there does not need to be a

complete unity of interest *per se*.[90]

Upon a review of those documents produced *in camera*, the arguments of counsel, and the

caselaw provided, the Court finds that the common legal interest privilege does not apply to the

communications at issue. First, as a preliminary note, the Court was not persuaded by the

Defendants' arguments related to UMB's previously denied Motion to Intervene in the Adversary

Proceeding.[91] The Court does not consider UMB's Motion to Intervene as persuasive evidence of

---

[84] Dkt. Nos. 132–133.
[85] Dkt. Nos. 107, 110.
[86] *See* Dkt. No. 107 at 10–16; Dkt. No. 110 at 7–15.
[87] *Santa Fe*, 272 F.3d at 710–11.
[88] *See, e.g.*, *Harwood*, 403 B.R. at 460–62.
[89] *Id.* at 460.
[90] *See, e.g.*, *In re Leslie Controls, Inc.*, 437 B.R. 493, 497 (Bankr. D. Del. 2010); *Harwood*, 403 B.R. at 460–61.
[91] Dkt. No. 107 at 10 ("Plaintiff and UMB have already admitted that they have distinct legal interests—that was the entire basis of UMB's proposed intervention—rendering common interest privilege inapplicable and the Court need not go further."); Dkt. No. 110 at 8.

a distinct or contrary interest between UMB and the Debtor.[92] In fact, *each party* necessarily took the opposite position it had previously taken with regard to the Motion to Intervene as it pertains to Defendants' Motions to Compel.[93] The Court does not give any weight to this argument.

Second, as to UMB and the Debtor or UMB and Lifespace, it is noteworthy that these parties did not enter into a joint defense agreement. Again, the lack of any formal agreement is not necessarily dispositive in determining whether a common interest privilege exists; however, the Court would have expected to see such an agreement, particularly in this instance where UMB, Lifespace and the Plaintiff claim an interest *many* months before the Defendants' conduct at issue in this Adversary Proceeding or the filing of the Chapter 11 cases.[94] The parties claim an overarching strategy to work together towards a restructuring, but oddly *never* formalized this strategy. This is somewhat noteworthy given that the evidence reflected that UMB *did* enter into a joint defense agreement with its noteholders.[95] The lack of such an agreement is at least *some* evidence against finding a common interest exists.

Third, and most importantly, the Court finds that the Plaintiff and UMB have failed to meet their burden, by virtue of the evidence presented and documents submitted *in camera*, that there was such an overarching strategy between the parties so that all communications would be privileged. The Debtors and UMB, its secured lender, are distinct and separate parties with their own sets of counsel and independent advisors addressing often distinct, separate legal and business

---

[92] *See* Dkt. No. 14 (Trustee's Motion for Leave to Intervene and File Complaint in Intervention and Brief in Support); Dkt. No. 61 (order denying intervention).

[93] *See, e.g.*, Dkt. No. 31 (Defendants' Joint Objection to Motion to Intervene).

[94] *Santa Fe*, 272 F.3d at 709 n.5 ("The defendants did nothing to show that the communications to third persons were made in anticipation of a common defense. On the contrary, the age of the communications, the lack of evidence of any common defense agreement, and Santa Fe's answers to plaintiffs' requests for admissions made a strong case against the common interest privilege claim.").

[95] Dkt. No. 110 at 13 n.3 ("Interestingly, UMB represented that it *does* have a formal joint representation agreement between it and the bondholders, indicating that UMB recognizes the significance of a written agreement for privilege assertions.") (emphasis in original).

issues. Though obviously not dispositive in determining these parties' relationship pre-petition, their actions post-filing are at least somewhat indicative of the reality of their relationship. What has been described as a common interest in these cases, an overarching strategy and unity of interests in regard to the bankruptcy, dissolved significantly for a time post-petition. UMB quickly determined that litigation was not a feasible "reorganization strategy," that the initial plan proposed by the Debtors (and approved by UMB) could not possibly go forward on a timely basis, and that exclusivity should terminate so that UMB could file its own plan.[96] UMB then followed through and filed its own plan, a sale plan pivoting vastly from the proposed strategy of the Debtors in the original plan of restructuring.[97]

More importantly, the evidence provided to the Court reflects that the ebbs and flows of the relationship between these parties also was a reality pre-petition. Perhaps UMB and the Debtors both believed and anticipated that they would need to work in concert to convince Intercity to restructure the Ground Lease, to stave off bankruptcy or proceed with a consensual bankruptcy; nonetheless, the evidence reflected that while these parties were allegedly working in concert, UMB declared a default on the bonds (without discussing it with the Debtors) and took other similar actions in its own interest as well.[98] Simply put, UMB and the Debtor *were not* acting in concert. A common "enemy" or common "adversary," at least under these facts, does not equate

---

[96] *See, e.g.*, Objection of the Trustee and DIP Lender to the Motion of Debtors for Entry of an Order Extending the Exclusivity Period for the Filing of a Chapter 11 Plan, Case No. 22-30659-MVL, Dkt. No. 639 (Bankr. N.D. Tex. 2022).
[97] Plan of Reorganization of the Trustee and DIP Lender Dated November 2, 2022, Case No. 22-30659-MVL, Dkt. No. 752 (Bankr. N.D. Tex. 2022).
[98] *See* Dkt. No. 107 at 13; Dkt. No. 108 at 79–80 (Ex. D - Notice of Default letter from UMB to Plaintiff on October 18, 2021).

to a common interest. The Court is wary to extend the privilege to parties whose relationship appears to be so consistently (and understandably) in flux without more evidence to the contrary.[99]

The Court reviewed the authority presented by UMB and the Debtors and recognizes that some bankruptcy courts have found a common interest privilege between a debtor and its creditor from time to time. The Court does not find these rulings on par to the facts in the present case.[100] For example, the Debtors cite to *Harwood*.[101]  In *Harwood*, the bankruptcy court found a common interest between the debtors, lenders, and the committee when those parties agreed to work together for the ultimate purpose of confirming a plan to recover/distribute the assets of the debtor by pursuing the debtor's causes of action against a third party.[102] That common interest was the pursuit of certain causes of action, not necessarily an overarching bankruptcy strategy like alleged here.[103] Likewise, UMB cites to *Mortgage & Realty Trust*.[104]  In *Mortgage & Realty Trust*, while the bankruptcy court did extend the common interest privilege to a creditors committee and a debtor, the interest itself regarded the claim of a third party, which eventually turned into litigation.[105] The interest was *not* some overarching strategy in how to proceed in bankruptcy, but rather a common interest in opposing a specific claim made in the bankruptcy case, which ripened into the litigation.[106]

The Court concedes that UMB and the Debtor might have had compatible and even somewhat similar *financial* goals, but they did not have a *common interest*. Put simply, a "rooting

---

[99] Dkt. No. 107 at 5 ("UMB's legal interests in this bankruptcy are diametrically adverse to Plaintiff's legal interests, which is no more perfectly illustrated than by UMB's Notice of Acceleration and Set Off of all amounts due from Plaintiff on February 24, 2022.").

[100] *See, e.g.*, *Harwood*, 403 B.R. at 460–62; *Value Prop. Tr. v. Zim Co. (In re Mortg. & Realty Tr.)*, 212 B.R. 649, 453–54 (Bankr. C.D. Cal. 1997).

[101] Dkt. No. 132 at 6.

[102] *Harwood*, 403 B.R. at 460–62.

[103] *See id.*

[104] Dkt. No. 133 at 20.

[105] *In re Mortg. & Realty Tr.*, 212 B.R. at 453–54.

[106] *See id.*

interest" against the Landlord, or better said, in support of a restructured lease, is not enough to trigger the privilege *under these facts*.[107] Expanding this privilege to a secured lender/creditor, with no joint defense agreement in place and *minimal* evidence presented, is unjustified on these facts. There are certainly instances in which parties to an impending bankruptcy proceeding could have a common interest as to trigger the privilege. This is not one of those instances.

The Plaintiff, UMB, and Lifespace have failed to meet their burden to show the common interest privilege applies to their prepetition communications. Accordingly, any documents related thereto must be produced.

### III.   Conclusion.

A wise, but fictional, Montana rancher, John Dutton, once said, "Lawyers are the swords of this century." These discovery disputes and the impressive skill of the attorneys that litigated them prove that quote true. These are complex issues, and the Court took great pain in its review of the *in camera* discovery and related caselaw in reaching what it believes to be the correct decision on these facts. The Court hopes this ruling provides clarity for the parties as they continue forward to the resolution of the Adversary Proceeding. Accordingly, it is hereby

**ORDERED** that Plaintiff's *Motion to Compel Defendants to Respond to Discovery Requests* [Dkt. No. 98] should be **GRANTED, in part, and DENIED, in part,** as set forth herein; it is further

**ORDERED** that Defendants' *Motion to Compel Discovery Compliance from Plaintiff* [Dkt. No. 106] should be **GRANTED**, as set forth herein; and it is further

**ORDERED** that Defendants' *Motion to Compel Discovery Compliance from UMB Bank, N.A.* [Dkt. No. 109] should be **GRANTED**, as set forth herein.

---

[107] In the Plaintiff's Motion to Compel, the Plaintiff itself readily admits that a rooting interest is insufficient to form a common interest. Dkt. No. 98 at 10 (collecting cases); *see also Ocwen*, 2016 WL 1031157, at *6.

**###END OF ORDER###**