

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed April 13, 2023**

_____
**United States Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| NORTHWEST SENIOR HOUSING CORPORATION | § § § § | Case No. 22-30659 |
| Debtor. | § § § | |
| NORTHWEST SENIOR HOUSING CORPORATION, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Adv. Pro. No. 21-03040 |
| INTERCITY INVESTMENT PROPERTIES, INC. AND KONG CAPITAL, LLC, | § § § § § | |
| Defendants. | § | |

**ORDER GRANTING PLAINTIFF'S MOTION TO**
**COMPEL PRODUCTION FROM DEFENDANTS**
**<u>RELATED TO THE MONUMENT GROUP, LLC</u>**

1

Before the Court is the *Second Motion to Compel Defendants to Respond to Discovery Requests* (the "**Monument Motion**")[1] filed by Plaintiff Northwest Senior Housing Corporation (the "**Plaintiff**" or "**Debtor**") on November 22, 2022. By the Monument Motion, the Plaintiff requests the Court enter an order compelling Intercity Investment Properties, Inc. ("**Intercity**" or "**ICI**") and Kong Capital, LLC ("**Kong**") (collectively, the "**Defendants**") to produce the communications and documents withheld based on certain assertions of privilege with the public relations firm, The Monument Group, LLC ("**Monument**"). On December 8, 2022, the Defendants filed their *Response in Opposition to Plaintiff's Second Motion to Compel Defendants to Respond to Discovery Requests*[2] and *Brief in Support*[3] (collectively, the "**Response**").[4] On December 15, 2023, the Court held a hearing on the Monument Motion. After hearing argument of counsel on the underlying issues, the Court took the matter under advisement with the intention of reviewing the production *in camera* and issuing a ruling thereon.

Less than one month later, on January 13, 2023, the Plaintiff filed its *Motion for Temporary Stay of Adversary Proceeding*[5] (the "**Stay Motion**"). The Defendants filed their *Response in Opposition to Plaintiff's Motion for Temporary Stay of Adversary Proceeding*[6] on January 24, 2023. The Court heard argument regarding the Stay Motion on January 25, 2023. At the conclusion of the hearing, the Court granted the Stay Motion. The Court subsequently entered an order

---

[1] Dkt. No. 224.
[2] Dkt. No. 247.
[3] Dkt. No. 248.
[4] The Defendants additionally filed their *Appendix in Support of Defendants' Response in Opposition to Plaintiff's Second Motion to Compel* on the same day. Dkt. No. 249.
[5] Dkt. No. 272.
[6] Dkt. No. 280.

2

temporarily staying the above-mentioned adversary proceeding (the "**Adversary Proceeding**"). At the time of this ruling, the Adversary Proceeding is still stayed.[7]

Notwithstanding the stay, the parties requested that the Court rule on the Monument Motion given it had been fully briefed and argued prior to that time. Accordingly, after considering the documents and communications produced *in camera*, as well as the briefing and oral arguments of counsel, the Court concludes that the relief requested in the Monument Motion should be **GRANTED**. The following constitutes the Court's analysis underlying the ruling herein.

I.   **Jurisdiction and Venue.**

The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), and the matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

II.   **Factual and Procedural History.**

On April 14, 2022, the Debtor filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code.[8] On the same day, the Debtor filed its Complaint alleging certain causes of action against Intercity and Kong.[9] Central to that Complaint were allegations that certain information disclosed in connection with a Forbearance Agreement between the parties and covered by a Non-Disclosure Agreement (the "**NDA**") was disclosed by the Defendants to various

---

[7] Dkt. No. 298. The Court held a status conference on April 4, 2023 on the abatement. At this status conference, the parties requested the abatement continue and another status conference be set for April 27, 2023.

[8] Voluntary Petition for Non-Individuals Filing for Bankruptcy, Case No. 22-30659-MVL, Dkt. No. 1 (Bankr. N.D. Tex. 2022).

[9] Dkt. No. 1. Specifically, the Plaintiff asserted seven (7) causes of action, including breach of contract, promissory fraud, tortious interference with existing contractual and business relations, tortious interference with prospective contractual and business relations, civil conspiracy, equitable subornation, and reformation of the Ground Lease. *See id.* The Plaintiff has since withdrawn its cause of action for tortious interference with existing contractual and business relations. Dkt. No. 58 at 23–24. The cause of action for tortious interference with prospective contractual and business relations has also been dismissed by Order of this Court. Dkt. No. 99 at 12–15.

parties in an effort to further damage the business of the Plaintiff and capitalize on an alternative business opportunity.[10]

The Defendants' legal counsel, Levenfeld Pearlstein, LLC's ("**Levenfeld**" or "**LP**"), entered into a Consulting Agreement with Monument on behalf of ICI, effective January 27, 2022.[11] The Consulting Agreement contemplated Monument providing public relations strategy "in connection with anticipated litigation involving the Edgemere[.]"[12] However, the Plaintiff asserts that the Defendants engaged Monument in reality to correspond with outside parties, including the Dallas Morning News (the "**DMN**"),[13] in furtherance of alleged efforts to destabilize the Edgemere.[14]

The Plaintiff served its initial discovery requests on Intercity and Kong on June 24 and 27, 2022, respectively. On August 1, 2022, the Defendants provided Edgemere with written responses, objections, and assertions of privilege. Subsequently, on August 29, 2022, the Plaintiff served a subpoena on Monument seeking its communications with the Defendants. Monument responded to the Plaintiff's subpoena on October 7, 2022 with a limited production and privilege log. Despite the parties' efforts, they were unable to resolve certain disagreements surrounding the assertions of privilege between the Defendants and Monument. Accordingly, the Plaintiff filed the

---

[10] Dkt. No. 1 at 2 ("Despite being under a non-disclosure agreement with Edgemere, and in possession of Edgemere's confidential information, *Defendants directly contacted the press* . . . all for the singular purpose of trying to manufacture an improper basis to terminate Intercity's 52-year ground lease with Edgemere and wrongfully retake the property on which the Community sits – all so that they can repurpose it to make a windfall profit.") (emphasis added). The Plaintiff has alleged a cause of action for breach of the NDA against Intercity. *Id.* at 17–19.
[11] Dkt. No 249 at 5–12.
[12] *Id.* at 5–6.
[13] The Court, on November 22, 2022, entered an order compelling production, in part, from the DMN. Dkt. No. 223.
[14] Dkt. No. 224 at 2 ("Defendants used Monument to assist with and directly participate in Defendants' quest to damage Plaintiff's reputation through The Dallas Morning News and other media outlets so that they could take over the Edgemere senior living facility.").

Monument Motion, seeking an order of this Court finding that the Defendants have failed to meet their burden of proving the existence of certain privileges and compelling production.[15]

### III. Analysis.

There are two issues before the Court by the Monument Motion, all of which have been generally covered as to other parties by prior rulings in this Adversary Proceeding.[16] First, the Court must answer whether the attorney client privilege applies to communications between Monument and the Defendants. More precisely, the Court must address whether Monument's services were essential to Levenfeld's legal advice as counsel to the Defendants. Second, the Court must determine whether the consulting expert privilege applies to shield these communications from production.[17] The Court answers both questions in the negative.

Accordingly, for the reasons stated herein, the Court **GRANTS** the Monument Motion. The following shall constitute the Court's ruling thereon:

### A. Attorney Client Privilege

The Plaintiff argues that Monument, as the public relations firm for the Defendants, was not necessary or indispensable to the Defendants' receipt of legal advice.[18] Thus, the Plaintiff asserts that the attorney-client privilege does not apply to the communications at issue.[19] The Defendants, however, claim that Monument was "essential to LP's legal advice."[20] Specifically,

---

[15] *See* Dkt. No. 224.
[16] *See, e.g.*, Dkt. No. 303.
[17] The Court does *not* believe that the common legal interest privilege is at issue. Dkt. No. 248 at 15 ("The common legal interest ruling has no bearing on the withheld internal communications with Monument Group at any time."). To the extent that question is before the Court, the Court finds that the common interest privilege, which existed as of February 23, 2022 between the Defendants, does *not* extend to Monument. *See* Dkt. No. 303 at 11–15. Monument was not a potential co-defendant, and the privilege should be narrowly construed only to those parties and their counsel that share the common interest. *See In re Sante Fe Intern. Corp.*, 272 F.3d 705, 710 (5th Cir. 2001) (citing *In re LTV Sec. Litig.*, 89 F.R.D. 595, 606 (N.D. Tex. 1981)).
[18] Dkt. No. 224 at 7–11.
[19] *See id.*
[20] Dkt. No. 248 at 13.

5

the Defendants claim that Monument's engagement was litigation-related and that Monument provided a need essential to its legal representation.[21] In simplest terms, the question is not whether the Defendants needed a public relations firm or whether the public relations firm worked hand in hand with Levenfeld in developing litigation-related communications. The question is whether the Levenfeld needed Monument in order to render ***legal advice***. The Court finds that Monument was ***not*** essential to Levenfeld rendering legal advice to the Defendants. Accordingly, the Court finds that the attorney-client privilege does not apply to communications between the Defendants and Monument.

The attorney-client privilege applies to communications, if it can be shown that: (1) the communication was confidential; (2) made to a lawyer or a lawyer's subordinate; and (3) for the primary purpose of securing either legal opinions or legal services, or assistance in a legal proceeding.[22] The burden of proof is on the privilege claimant,[23] and the applicability of the privilege is a highly fact-specific inquiry by the Court.[24] Because the effect of the attorney-client privilege is to restrict or withhold relevant information from the fact-finder, it has been interpreted narrowly by the Fifth Circuit.[25] It is important to note that the Defendants opted ***not*** to put on any witnesses to describe Monument's relationship to the litigation, instead opting for the Court to review the documents *in camera*.[26]

---

[21] *Id.* ("Frank, candid communications between the attorney and/or client, and Monument Group was (and is) essential to LP's legal advice.").
[22] *Jolivet v. Compass Group USA, Inc.*, 340 F.R.D. 7, 19 (N.D. Tex. 2021) (citing *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)).
[23] *King v. Healthcare System, L.C.*, 645 F.3d 714, 720–21 (5th Cir. 2011); *Santa Fe*, 272 F.3d at 710.
[24] *King*, 645 F.3d at 721; *Jolivet*, 340 F.R.D. at 20–21.
[25] *Santa Fe*, 272 F.3d at 710.
[26] Counsel to the Defendants provided no explanation why no witness would be put forward to testify in support of the Monument Motion. This was particularly risky given the authority relied upon by ICI in the Monument Motion makes clear it is a *fact-specific inquiry*.

6

Typically, the disclosure of information to third parties constitutes a waiver of the attorney-client privilege. However, there is a narrow exception if the disclosures are to professionals hired to assist the lawyer in providing legal services to the client.[27] This concept was first articulated by the Second Circuit in *United States v. Kovel*,[28] and has since been adopted by the Fifth Circuit.[29] In *Kovel*, the Second Circuit held that the services of the accountants in that case were necessary for effective communication between the client and the lawyer.[30] The *Kovel* court analogized the accountant to an interpreter who was necessary to relate a "complicated tax story to the lawyer."[31] "What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer."[32] As the *Kovel* court explained, "if the lawyer has directed the client . . . to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege."[33] Yet, there is no privilege where "the advice sought is the accountant's rather than the lawyer's."[34]

Levenfeld, on behalf of the Defendants, entered into an agreement with Monument on January 27, 2022, for the purpose of "assist[ing] with [the] development of communications in connection with anticipated disputes and litigation with … Northwest Senior Housing Corporation."[35] The Defendants argue the *Kovel* doctrine should be extended to Monument for the public relations services contemplated by this agreement, alleging that they were done in

---

[27] *See United States v. Kovel*, 296 F.2d 918, 920 (2d Cir. 1961); *Ferko v. National Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125, 134–35 (E.D. Tex. 2003).
[28] 296 F.2d 918, 920 (2d Cir. 1961)
[29] *United States v. El Paso Co.*, 682 F.2d 530, 541 (5th Cir. 1982) (citing and adopting the *Kovel* doctrine).
[30] *Kovel*, 296 F.2d at 922; *see also In re Hardwood P-G, Inc.*, 403 B.R. 445, 458 (Bankr. W.D. Tex. 2009).
[31] *Kovel*, 296 F.2d at 922.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] Dkt. No. 249 at 5–6 (Exhibit "A").

furtherance of Levenfeld's legal representation of the Defendants.[36] While the extension of the attorney-client privilege to a public relations firm is certainly unique, it is admittedly not unheard of or novel. The Defendants cite two decisions from the Southern District of New York in support of this proposition: (1) *In re Grand Jury Subpoenas Dated March 24, 2003 Directed to (A) Grand Jury Witness Firm & (B) Grand Jury Witness*[37] and (2) *In re Copper Mkt. Antitrust Litig.*[38] However, both cases are distinguishable from the facts at hand.

In *Copper*, a foreign company found itself in the middle of a high profile copper trading scandal and hired a public relations firm because the company lacked experience in dealing with Western media.[39] The firm served as the foreign company's spokesperson in dealing with the Western press and conferred frequently with the company's litigation counsel in the United States to prepare draft press releases and other materials *incorporated into the lawyer's advice.*[40] The *Copper* court described the public relations firm as "the functional equivalent of an in-house public relations department . . . having authority to make decisions and statements on [the Defendant's] behalf, and seeking and receiving legal advice from [the Defendant's] counsel with respect to the performance of its duties."[41] Accordingly, the court held that the communications with the firm were necessary to render legal advice to the client and upheld the privilege.[42] In finding the attorney-client privilege covered the firm, the *Copper* court specifically looked to whether the corporations' agents (the firm) possessed information *needed* by the corporation's attorneys to render *informed legal advice* to the clients.[43] This is unlike the case at hand where Monument itself

---

[36] Dkt. No. 248 at 9–13.
[37] 265 F. Supp. 2d 321 (S.D.N.Y. 2003).
[38] 200 F.R.D. 213 (S.D.N.Y. 2001).
[39] *Id.* at 215.
[40] *Id.* at 215–16.
[41] *Id.* at 216; *see also id.* at 219–220, 223.
[42] *See id.* at 219.
[43] *See id.* at 219–220.

8

possessed no information necessary to provide legal advice to the Defendants.[44] The Defendants have provided **no evidence** to this Court to show that Monument had access to information, not accessible to the Defendants' attorneys, that was necessary to the attorneys' ability to render informed legal advice to the Defendants.

Further, the *Copper* firm was retained to ensure the company's public statements would not result in further exposure to litigation from the scandal; the firm ostensibly became the defendant company's in-house public relations firm to handle litigation-related crisis management.[45] That is factually dissimilar from the instant case in which Monument's role was to interface with the press in furtherance of the Defendants' reputational and business goals. Monument was not so intertwined with the Defendants nor do the facts of this case present such a similar crisis as to necessitate the need of a public relations firm, by Levenfeld, to effectively provide legal advice to the Defendants.[46]

Further, in *Grand Jury*, the court found that communications between the lawyers and the public relations consultants were necessary to "neutralize what the attorneys perceived as a climate of opinion pressing prosecutors and regulators to act in ways adverse to [the Defendant's] interests" and thus extended the attorney-client privilege to these communications.[47] The court explained that the firm's assignment was "distinguish[able]…from *standard public relations work*" because its "target audience was *not* the public at large."[48] Rather, the firm was "focused on affecting the media coverage message that reached the *prosecutors and regulators* responsible for

---

[44] *See e.g.*, *Kovel*, 296 F.2d at 922 ("[I]f the advice sought is the accountant's rather than the lawyer's, no privilege exists.").
[45] *Copper*, 200 F.R.D. at 215–20.
[46] Again, the *Copper* firm was necessary due to the company's inexperience with the Western media. *Id.* at 215–16. This is undeniably different that the facts at hand in which counsel for a Texas company retained a Texas public relations firm to ensure its reputation was protected largely within Texas.
[47] *See Grand Jury*, 265 F.Supp.2d at 326–32.
[48] *Id.* at 323 (emphasis added).

charging decisions in the investigations concerning" the defendant in that case.[49] These facts are readily distinguishable from the case at hand. Here, Monument was not engaged by the attorneys to protect the Defendants' ability "to obtain a fair trial," but rather for a more traditional public relations purpose. Monument's role was to persuade the public's perception of the bankruptcy and ICI's litigation practices and to assuage residents of ICI's "backup plan" for the Edgemere in order to appear as a "white knight." Monument functioned as a typical public relations firm, and the target audience was the public at large.

The Court's review of the *in camera* production supports that Monument was nothing more than a typical public relations firm hired to craft reputational messaging for the public. ICI engaged Monument to "go on the offensive" and "proactively" start a public conversation rather than sitting back and responding. Again, as articulated in *Kovel*, "[w]hat is vital to the privilege is that the communication be made in confidence *for the purpose of obtaining legal advice* from the lawyer."[50] "[T]he burden is on the party asserting the privilege to demonstrate how each document or communication satisfies each element[.]"[51] The Court was not persuaded by the argument of counsel, the authority cited, or the *in camera* review that the communications at issue were in furtherance of Levenfeld's legal advice to the clients. The fact that Levenfeld proactively sought public relations strategy advice for its clients does not mean that the attorney-client privilege *automatically* extends to the communications.

---

[49] *Id.* at 323–24.
[50] *Kovel*, 296 F.2d at 922 (emphasis added).
[51] *Sorrell v. Reeves*, Civ. Action No. 4:18-CV-00354, 2019 WL 5310668, at *4–5 (E.D. Tex. Oct. 21, 2019) ("[T]he [defendants] argue that [the accountants] were retained to assist in providing legal services. This argument is supported by each of their *Kovel* agreements. These agreements state that they were retained to 'assist [the attorneys] in rendering legal advice to the Client, including but not limited to, summarizing and analyzing financial data, and reflecting its work in summaries, analyses, and schedules.' Finally, this statement was also included in the declaration submitted to support the response. However, **this general allegation is insufficient** to demonstrate that [the accountants] solely assisted in rendering legal services.") (emphasis added).

Finally, unlike *Copper* and *Grand Jury*, the Court found another case from the Southern District of New York to be more factually similar to the case at hand: *Calvin Klein Trademark Trust v. Wachner*.[52] In *Calvin Klein*, plaintiff's counsel hired a public relations firm in anticipation of a potential high-profile civil suit. Counsel contended the firm was hired for defensive purposes, including understanding the reaction from the public at large to the plaintiff's litigation, rendering legal advice, and dealing with the media interest.[53] Eventually, the plaintiff refused production of communications between the firm and an employee on the ground of attorney client privilege.[54] Judge Jed S. Rakoff rejected the privilege assertion because: (1) his review of the privilege documents found few if any of them were confidential communications for the purpose of obtaining legal advice; (2) the evidence showed the firm was simply providing ordinary public relations advice; and (3) there was no reason to broaden to the privilege to any documents an ordinary public relations firm would perform if hired.[55] "**It may be that the modern client comes to court as prepared to massage the media as to persuade the judge; but nothing in the client's communications for the former purpose constitutes the obtaining of legal advice or justifies a privileged status**."[56] Like *Calvin Klein*, the *in camera* documents produced did not reflect legal advice, nor did they present anything more than ordinary public relations advice for appealing to the public at large. The Court finds no reason to expand the privilege for such an ordinary public relations purpose.[57]

---

[52] 198 F.R.D. 53 (S.D.N.Y. 2000).
[53] *Id.* at 54; *see also Grand Jury*, 265 F.Supp.2d at 328 (summarizing *Calvin Klein*).
[54] *Calvin Klein*, 198 F.R.D. at 54.
[55] *Id.* at 54–55.
[56] *Id.* at 55 (emphasis added).
[57] *Id.* ("[I]t must not be forgotten that the attorney-client privilege, like all evidentiary privileges, stands in derogation of the search for truth so essential to the effective operation of any system of justice: therefore, the privilege must be narrowly construed. Yet plaintiffs' approach would, instead, broaden the privilege well beyond prevailing parameters.").

11

The pertinent question is always whether the communications were for the purpose of obtaining *legal advice*. Here, they undeniably were not. Accordingly, the Court finds that the communications at issue are not protected by attorney-client privilege.

### B. Consulting Expert Privilege

The Defendants asserts that the communications at issue are shielded from production because Monument was a consulting expert retained in anticipation of litigation.[58] They specifically point the Court to the language of the Consulting Agreement, which sets forth that Monument was retained to assist with "anticipated disputes and litigation with various parties related to [Edgemere]."[59] In response, the Plaintiff argues that Monument was not retained in anticipation of litigation and therefore cannot be a consulting expert.[60] Even if the Court were to find that Monument was retained in anticipation of litigation, the Plaintiff argues that Monument is a fact witness for which the consulting expert privilege was not meant to extend.[61] For the foregoing reasons, the Court finds that Monument was not retained in anticipation of litigation. Even if the Court were to find that Monument was retained for such a purpose, the consulting expert privilege would not extend to Monument as it was actively involved in the facts underlying this Adversary Proceeding.

The party resisting discovery has the burden to prove that the asserted privilege applies.[62] The consulting expert privilege stems from Rule 26 of the Federal Rules of Civil Procedure (the "**Federal Rules**"), made applicable to this Adversary Proceeding by Rule 7026 of the Federal Rules of Bankruptcy Procedure, which makes clear that a party ordinarily cannot discover

---

[58] Dkt. No. 248.
[59] *Id.* at 9.
[60] Dkt. No. 224 14–16.
[61] *Id.* at 14–17.
[62] *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985); *see also see also Mims v. Dallas County*, 230 F.R.D. 479, 484 (N.D. Tex. 2005) ("The burden is on the party who seeks work product protection to show that the materials at issue were prepared by its representative in anticipation of litigation or for trial.").

consulting expert work product, defined as that of "an expert who has been retained or specially employed by another party *in anticipation of litigation* or to prepare for trial and who is not expected to be called as a witness at trial."[63] The Fifth Circuit has interpreted "anticipation of litigation" to mean the party had reason to anticipate litigation and "the **primary** motivating purpose behind the creation of the document was **to aid** in possible future litigation."[64]

Again, as previously stated both in this ruling and other orders of this Court, the Court's fact-finding was *severely* handicapped by the Defendants' choice to put on no witnesses in support of the privilege claimed.[65] No representative from Kong, ICI, or Monument testified; rather, the Defendants rested solely on the *in camera* production for the Court's review. This choice was particularly questionable in light of the fact that the documents reflected that ***Kong, not Levenfeld or ICI***, initially sought to retain Monument. The Court reviewed the *in camera* production, and it was not satisfied that the entirety of the communications sought to be found privileged are that of a consulting expert. Communications included, among other things, Monument's advice as to branding or marketing in the event the property returned to ICI, potential resident and third-party outreach, communications related to "positioning" Kong as an expert in CCRCs and a "reliable solution" for the future of the Edgemere, and certain opposition research (industry statistics, financials, etc.) to be conducted. These communications made it readily apparent that Monument was retained to manage public relations in support of ICI's interest in the property, not solely and specifically for litigation purposes. Thus, the "primary motivating purpose" behind these

---

[63] Fed. R. Civ. P. 26(b)(4)(D) (emphasis added).
[64] *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (emphasis added); *see also Mims*, 230 F.R.D. at 483 ("A document need not be generated in the course of an ongoing lawsuit in order to qualify for work product protection. However, 'the primary motivating purpose' behind the creation of the document *must* be to aid in possible future litigation.") (emphasis added).
[65] *See, e.g.*, Dkt. No. 303 at 7 ("The Court finds that Kong is not a consulting expert as it was not retained in anticipation of litigation. First, as a preliminary note, the Court notes that Intercity opted to not have a Kong or Intercity representative testify. This choice severely handicapped the Court's fact finding, particularly in light of the recognition that Kong and Intercity contemplated, from time to time, two distinct roles for Kong.").

communications was not in support of any litigation strategy.[66] The argument that the Consulting Agreement "speaks for itself" in insufficient. The exertion of a privilege is an obstacle to truth-seeking that ***must be narrowly construed*** to effectuate consultation between ***legal*** advisors and clients.[67] The Court will not extend the privilege in the face of such scant evidentiary support, nor should it when the interest does not appear to be primarily litigation-based. Accordingly, the Court finds that the consulting expert privilege does not extend to the Monument communications.

Alternatively, even if the Court were to find that Monument was retained for such a purpose, the consulting expert privilege should not be extended to a party that was an actor or viewer of the circumstances underlying the litigation.[68] Monument was not a mere expert or observer to the facts of this case; rather, Monument's communications with the Defendants and/or third parties are directly at issue in relation to the Plaintiff's causes of action.[69] The Advisory Committee Notes to Federal Rule 26(b)(4) clarify that the rule "does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit," in which case, "[s]uch an expert should be treated as an ordinary witness."[70] As this Court noted in its prior opinion:

> A person is not a consulting expert if he is an actor with regard to the occurrences from which the tapestry of the lawsuit was woven, whose opinion about causation is premised on personal knowledge and observations made in the course of treatment. An expert whose opinion testimony arises not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation is not a consulting expert.[71]

---

[66] *Mims*, 230 F.R.D. at 483.
[67] *Santa Fe*, 272 F.3d at 710.
[68] *See In re Taxotere (Docetaxel) Products Liab. Litig.*, No. MDL 16-2740, 2018 WL 5669019, at *3 (E.D. La. Nov. 1, 2018) (noting the Rule 26(b)(4) does not address information obtained because the individual was an actor or viewer of the circumstances surrounding the lawsuit).
[69] *Id.* at *4.
[70] Fed. R. Civ. P. 26 advisory committee's note.
[71] *See* Dkt. No. 303 at 10–11 (quoting *Taxotere*, 2018 WL 5669019, at *4) (internal quotations omitted).

Here, Monument was specifically retained to interface with third parties and control the public relations strategy of the Defendants.[72] Communications with third parties, such as the DMN, are specifically at issue by the Complaint.[73] The Plaintiff seeks to determine whether or not communications with third parties breached the NDA, as well as the Defendants' motivations behind certain actions taken prepetition.[74] The language of the Consulting Agreement alone does not make Monument a consulting expert for purpose of shielding otherwise discoverable communications, and the Court will not extend the privilege to an alleged expert tied so intimately to the underlying facts of this litigation.

Accordingly, the Court finds that Monument was not retained in anticipation of litigation as to be a consulting expert for these purposes. Even if Monument was a consulting expert, the Court finds that the privilege could not be extended to Monument under these facts because it was an actor in the factual circumstances underlying these causes of action.

## IV. Conclusion.

The Defendants failed to meet their burden of demonstrating the existence of the privileges asserted. Therefore, based upon the foregoing and the record before the Court, it is hereby

**ORDERED** that the Plaintiff's *Second Motion to Compel Defendants to Respond to Discovery Requests*[75] is hereby **GRANTED**, as set forth more fully in the Order.

###END OF ORDER###

---

[72] Dkt. No. 249 at 5 ("Client hereby engages Consultant to provide strategic communications consulting services and counsel as requested by Client.").
[73] Dkt. No. 1 at 17–19; *see also* Dkt. No. 224 at 17 ("Monument actively aided in this effort by shopping potential articles to the DMN concerning (and mischaracterizing) Plaintiff's financial struggles and setting up numerous DMN interviews with Defendants' representatives. In fact, this is one of the principal bases of Plaintiff's claims against Defendants; namely, that Defendants improperly disclosed Plaintiff's confidential information to the DMN, among others, in violation of the Non-Disclosure Agreement, in order to harm Plaintiff's business and wrongfully obtain control of the Edgemere senior living facility.").
[74] *See* Dkt. No. 1 at 17–22 (asserting causes of action for both Breach of the NDA and Promissory Fraud).
[75] Dkt. No. 224.