

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed August 19, 2025**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **NORTHWEST SENIOR** | § | **Case No. 22-30659-mvl11** |
| **HOUSING CORPORATION**, *et al.*, | § | |
| Debtor. | § | |
| | § | |
| | § | |
| **LEIF M. CLARK, TRUSTEE OF** | § | |
| **THE EDGEMERE LITIGATION** | § | |
| **TRUST,** | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adv. Pro. No. 22-3040-MVL** |
| | § | |
| **INTERCITY INVESTMENT** | § | **Civ. Action No. 3:24-cv-03075-E** |
| **PROPERTIES, INC., and KONG** | § | |
| **CAPITAL LLC,** | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |

### REPORT AND RECOMMENDATION TO THE DISTRICT COURT REGARDING
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court[1] is the *Motion for Summary Judgment* [ECF No. 565] and *Defendants'*
*Brief in Support of their Motion for Summary Judgment* [ECF No. 566] (collectively, the "**MSJ**")
filed by Defendants Intercity Investment Properties, Inc. ("**ICI**") and Kong Capital LLC ("**Kong**")
(collectively, the "**Defendants**") on February 7, 2025, seeking summary judgment as to all counts
of the *First Amended Complaint* [ECF No. 422] (the "**Amended Complaint**"). On March 10,
2025, Leif M. Clark, Trustee of the Edgemere Litigation Trust (the "**Plaintiff**") filed his *Response*
*to Defendants' Motion for Summary Judgment* [ECF No. 577] and *Brief in Support of its Response*
*to Defendants' Motion for Summary Judgment* [ECF No. 578]. On April 3, 2025, the Defendants
filed their *Reply in Support of their Motion for Summary Judgment* [ECF No. 586]. On April 16,
2025, the Court held a hearing on the MSJ (the "**Hearing**"). ECF No. 591. After hearing oral
arguments from counsel for both the Plaintiff and the Defendants, the Court took the matter under
advisement. After considering the briefing and arguments of counsel, the Court recommends that
the MSJ should be GRANTED in part and DENIED in part as more fully detailed herein.

## I.    JURISDICTION AND VENUE

The District Court has subject matter jurisdiction over the Adversary Proceeding under 28
U.S.C. § 1334. 28 U.S.C. § 151 grants bankruptcy courts the power to exercise certain "authority
conferred" upon the district courts. Under 28 U.S.C. § 157, district courts may refer bankruptcy
cases and proceedings to bankruptcy courts for either entry of a final judgment in "core"
proceedings or, absent consent of the parties, proposed findings and conclusions in "non-core,

---

[1] For the purposes of this report and recommendation, all capitalized references to the Court (the "**Court**") are made
in reference to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. Likewise, all
capitalized references to the District Court (the "**District Court**") are made in reference to the United States District
Court for the Northern District of Texas, Dallas Division. All capitalized references to the Bankruptcy Proceeding (the
"**Bankruptcy Proceeding**") are made in reference to Case No. 22-30659-MVL11 (Bankr. N.D. Tex. 2022). All
capitalized references to the Adversary Proceeding (the "**Adversary Proceeding**") are made in reference to Adv. Pro.
No. 22- 3040-MVL (Bankr. N.D. Tex. 2022).

related to" proceedings. This matter is not a core proceeding and the Court lacks authority to enter a final order. Likewise, the Defendants do not consent to this Court's entry of final orders.

Furthermore, the Defendants filed an *Unopposed Motion to Withdraw the Reference Under 28 U.S.C. § 157(d) and Fed. R. Bankr. P. 5011* (the "**Motion to Withdraw**") on November 25, 2024. ECF No. 555. On January 7, 2025, the Court conducted a status conference concerning the Motion to Withdraw. On February 19, 2025, the Court entered its *Report and Recommendation to District Court Regarding Unopposed Motion for Withdrawal of the Reference* (the "**Withdrawal Report & Recommendation**"). In the Withdrawal Report & Recommendation, the Court recommended that the District Court withdraw the reference in this Adversary Proceeding, but only at such time as the Court certifies to the District Court that the litigation is trial-ready. The Withdrawal Report & Recommendation was transmitted to the District Court on February 19, 2025, where it is currently pending before the Honorable Ada Brown, Case No. 3:24-CV-03075-E. Accordingly, this Report and Recommendation shall constitute the proposed findings and conclusions of the Court with respect to the MSJ.

## II.    CURRENT PROCEDURAL POSTURE

On April 14, 2022 (the "**Petition Date**"), Northwest Senior Housing Corporation ("**Edgemere**" or the "**Debtor**") filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. Bankruptcy ECF No. 1.[2] On the same day, the Debtor filed its Complaint (the "**Original Complaint**") alleging seven causes of action against ICI and/or Kong. ECF No. 1. The causes of action included: (1) Breach of Contract (NDA) against ICI; (2) Promissory Fraud against ICI; (3) Tortious Interference with Existing Contractual and Business Relations against both

---

[2] "**Bankruptcy ECF**" shall refer to the docket in the main bankruptcy proceeding, Case No. 22-30659-mvl11 (Bankr. N.D. Tex. 2022).

3

Defendants; (4) Tortious Interference with Prospective Contractual and Business Relations against both Defendants; (5) Civil Conspiracy against both Defendants; (6) Equitable Subordination against ICI; and (7) Reformation of the Lease against ICI. *See id.*

On June 1, 2022, the Defendants filed their *Motion to Dismiss for Failure to State a Claim* [ECF No. 34] (the "**Motion to Dismiss**"), which sought to dismiss the Original Complaint. The Court held a hearing on the Motion to Dismiss on July 21, 2022. On August 24, 2022, the Court issued its *Order Granting in Part and Denying in Part the Defendant's Motion to Dismiss the Complaint for Failure to State a Claim* [ECF No. 99] (the "**Dismissal Order**"). In the Dismissal Order, the Court found that the Original Complaint, other than the claim for tortious interference with prospective contracts, contained sufficient factual allegations to state a plausible cause of action, and therefore granted in part and denied in part the Motion to Dismiss. ECF No. 99, at 22.

On January 13, 2024, the Debtor filed its *Motion for Temporary Stay of Adversary Proceeding* (the "**Stay Motion**"), seeking to stay the Adversary Proceeding so that parties could focus their time and resources on confirmation of the pending joint plan of reorganization in the Bankruptcy Proceeding. ECF No. 272. After notice and a hearing, on February 1, 2023, the Court entered its *Order Granting Temporary Stay of Adversary Proceeding*, staying the Adversary Proceeding and abating all deadlines set forth in the *Second Amended Scheduling Order*. ECF No. 298.

On April 4-5, 2023, the Court held a confirmation hearing on the *Fourth Amended Chapter 11 Plan of the Plan Sponsors Dated February 17, 2023* (the "**Plan**") [Bankruptcy ECF No. 1241]. On April 7, 2024, the Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming Chapter 11 Plan of Plan Sponsors* (the "**Confirmation Order**"). Bankruptcy ECF No. 1393. On June 20, 2023, the Debtors filed their *Notice of (I) Entry of Findings of Fact, Conclusions*

*of Law, and Order Confirming Chapter 11 Plan of Plan Sponsors; (II) Effective Date of Plan Sponsors' Chapter 11 Plan; and (III) Certain Post-Effective Date Deadlines*, in part giving notice that the Effective Date of the Plan occurred on June 13, 2023. Bankruptcy ECF No. 1620. Pursuant to the Confirmation Order, a Litigation Trust was established, which transferred all of the Litigation Trust Assets, including the claims asserted in this Adversary Proceeding to the Litigation Trust. Subsequent to the Effective Date, Leif M. Clark was appointed as the Trustee for the Litigation Trust. On July 25, 2023, the Trustee filed his *Unopposed Motion to Substitute Leif M. Clark, Trustee of the Edgemere Litigation Trust, as Party-Plaintiff and Counter-Defendant*. ECF No. 322. During a status conference on July 26, 2023, the Court lifted the abatement of this Adversary Proceeding [ECF No. 324], and on July 27, 2023, the Court entered its *Order Substituting Leif M. Clark, Trustee of the Edgemere Litigation Trust, as Party-Plaintiff and Counter-Defendant*. ECF No. 327.

On November 13, 2023, the Plaintiff filed its Amended Complaint alleging many of the same causes of action from the Original Complaint, as well as some new causes of action, namely: (1) Breach of the NDA against both Defendants; (2) Promissory Fraud against ICI; (3) Tortious Interference with Existing Contractual and Business Relationships against Kong; (4) Tortious Interference with Prospective Contractual and Business Relationships against both Defendants; (5) Business Defamation and Disparagement against both Defendants; (6) Breach of Forbearance Agreement against ICI; (7) Civil Conspiracy against Both Defendants; and (8) Equitable Subordination against ICI. ECF No. 422. The Amended Complaint was originally filed under seal pursuant to the *Second Amended Stipulated Protective Order* [ECF No. 270], but was unsealed on March 25, 2024, pursuant to an *Agreed Order to Unseal Documents* [ECF No. 506].

On December 18, 2023, the Defendants filed their *Motion for Judgment on the Pleadings on Counts 1, 2, 3, 4 ,5, 7, and 8 of the First Amended Complaint* (the "**Motion for Judgment on the Pleadings**") pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (the "**Rules**"). ECF No. 445. On February 22, 2024, the Court held a hearing on the Motion for Judgment on the Pleadings and heard oral argument. ECF No. 483. On June 3, 2024, the Court entered its *Order Granting in Part and Denying in Part the Defendants' Motion for Judgment on the Pleadings* (the "**12(c) Order**"). ECF No. 517. In the 12(c) Order, the Court granted the Motion for Judgment on the Pleadings on Count 1: Breach of the NDA as to Kong but denied the rest of the relief requested by the Defendants. *Id.*

The Court has also heard numerous discovery disputes during the pendency of this case, resulting in the following orders:

- *Order Granting Plaintiff's Motion to Compel Production from the Dallas Morning News, in Part* [ECF No. 223]
- *Order Granting in Part Defendants' Motion to Compel Plaintiff's Production of Documents* [ECF No. 262]
- *Order Regarding Court's In Camera Review of Certain Documents in Connection with Plaintiff and Defendants' Motion to Compel Production* [ECF No. 303]
- *Order Granting Plaintiff's Motion to Compel Production from Defendants Related to the Monument Group, LLC* [ECF No. 309]
- *Order Regarding the Production of Documents by Lifespace Communities, Inc.* [ECF No. 314]
- *Supplemental Order Granting in Part Defendants' Motion to Compel Production of Documents* [ECF No. 411]
- *Order Granting Motion to Clarify the Order Regarding the Production of Documents by Lifespace Communities, Inc.* [ECF No. 418]
- *Order Granting in Part Defendant's Motion to Compel Production by Plaintiff* [ECF No. 423]
- *Order Granting in Part and Denying in Part as Moot Defendants' Omnibus Motion to Compel* [ECF No. 424]
- *Order Granting in Part and Denying in Part Plaintiff's Motion to Remove Attorneys Only and Confidential Designations from Selected Documents Produced in Discovery* [ECF No. 437]
- *Order Granting in Part and Denying in Part Defendants' Motion to Compel Production by Plaintiff* [ECF No. 490]

- *Order Granting in Part and Denying in Part Defendants' Motion to Compel Plaintiff to Respond to Second Set of Discovery Requests* [ECF No. 508]
- *Order on Motions to Compel* [ECF No. 512]
- *Order Granting in Part and Denying in Part Defendant's Motions to Compel After Production of Documents In Camera* [ECF No. 521]

Finally, on February 7, 2025, the Defendants filed their *Motion to Exclude Certain of Chad Shandler's Opinion Testimony* (the "**Motion to Exclude**") [ECF No. 569]. After an agreed continuance of the Motion to Exclude, the Court conducted a hearing on the Motion to Exclude on July 2, 2025. The Motion to Exclude remains under advisement.

## III.   UNDISPUTED FACTS

Northwest Senior Housing Corporation was formed to build and operate a continuing care retirement community (a "**CCRC**") located on real property located in Dallas, Texas. ECF No. 576-1 at 38-39. As developed, the community was a 504-unit "life care entrance-fee model" CCRC. *Id.* at 111. Under Edgemere's life care entrance-fee model, a resident interested in occupying an independent living unit in the community would enter into a "Life Care Agreement" with Edgemere under which the resident would pay a one-time entrance fee and then fixed monthly fees (subject to periodic rate increases) in exchange for Edgemere's commitment to provide assisted living, memory, or nursing care should the need for such service arise during the duration of the resident's life. *Id.* at 112-13. Unlike in other retirement communities, Edgemere's residents would not face steep increases in monthly fees in the event they required higher levels of care. *Id.*

Further, each independent living resident was given the option for some portion of the entrance fee to be refunded to the resident or to the resident's estate once the resident moved out and the unit was occupied by a new resident who paid a new entrance fee. *Id.* at 113-14. As of the Petition Date, Edgemere had contingent entrance fee liabilities to residents totaling $122,823,059 and untriggered entrance fee refund liabilities to former residents—that is, those that would be

come due upon re-occupancy of a vacated unit and payment of a new entrance fee—totaling $25,549,457. *Id.* at 118-19.

Edgemere leased the land on which its community was built pursuant to a 1999 ground lease (as amended from time to time, the "**Lease**" or the "**Ground Lease**") with a fifty-five-year term, that absent contrary action, would expire in 2054. *Id.* at 121. The Lease further provides that, upon expiration or termination, the lessor—Defendant ICI—can, at its option, "either terminate any or all existing subleases or subtenancies hereunder, including, without limitation, any life care contracts" or, instead, assume them. ECF No. 576-13 at 94.

In or around 1999, Edgemere financed the construction and initial operation of the community with tax-exempt bonds. ECF No. 576-1 at 38 & 41. A senior living community developer and manager, called Greystone Communities, developed the community and served as its manager until late 2017 or early 2018. *Id.* at 115. Additional bonds were issued in 2015 and 2017. *Id.* at 117. As of the Petition Date, the total secured indebtedness outstanding under the bonds was approximately $111,728,919. *Id.*

In or around May 2019, Lifespace Communities, Inc. ("**Lifespace**") entered an affiliation agreement with debtor Senior Quality Lifespace Corporation ("**SQLC**"), following which Lifespace became the sponsor of Edgemere and other CCRCs. *Id.* at 115. In late 2020 and early 2021, Edgemere, under the new leadership of Lifespace, engaged professionals to evaluate its capital structure, including its significant liabilities, to develop strategies to improve Edgemere's operations and long-term financial stability. Edgemere attempted to purchase the land that the community was on from ICI, but ICI declined to sell. *Id.* at 42. Edgemere also solicited a consensual amendment to the Lease with ICI, which ICI also declined. *Id.*

In an effort to bring ICI to the negotiating table, Edgemere stopped paying rent in September 2021. ECF No. 576-4 at 37-38. As a condition to sharing confidential information regarding Edgemere and the community, Edgemere required ICI to sign a Confidentiality and Non-Disclosure Agreement dated September 7, 2021 (the "**NDA**"). ECF No. 581-13 at 55-59. In the NDA, the parties state that they are "interested in evaluating and discussing various strategic business and/or financial options related to the Ground Lease." *Id.* In an effort to achieve these goals, on November 29, 2021, Edgemere's counsel sent a report prepared by FTI Consulting ("**FTI**") containing Edgemere's five-year projections to ICI's counsel pursuant to the NDA. *Id.* at 19-50.

In the meantime, while discussions between Edgemere and ICI were ongoing, Kong made initial contact with ICI on November 9, 2021, to propose "an alternative plan" and to "explore a partnership." ECF No. 581-12 at 2. On November 22, 2021, Kong sent ICI a draft letter of intent, proposing that ICI would contribute capital while Kong would manage negotiations through the bankruptcy process, be the public face of the transition to a rental community, and manage the community. On December 2, 2021, Kong met with ICI to discuss the structure of the deal between the two parties. ECF No. 581-12 at 4-6. On December 13, 2021, Kong entered into a consultancy agreement with ICI, which noted that Kong would act as an independent contractor to perform due diligence on the leasehold interest and to review any restructuring and transition plan advanced by Edgemere. ECF No. 581-6 at 1. The next day, on December 14, 2021, Kong and ICI came to a good faith understanding that would make Kong the new lessee if ICI were to retake possession of the property. ECF No. 581-5 at 8. On December 17, 2021, Kong provided ICI with an analysis of Edgemere's FTI report. ECF No. 581-14 at 6.

On December 21, 2021, Edgemere entered into a forbearance agreement (the "**Forbearance Agreement**") with ICI and the Debtor's bond trustee, UMB Bank NA ("**UMB**"), with an expiration date of December 31, 2021. ECF No. 576-13 at 134. On December 28, 2021, UMB's counsel circulated an extension of the Forbearance Agreement. *See* ECF No. 581-5 at 79. The Forbearance Agreement expired before that extension was executed.

On January 7, 2022, counsel for ICI, Edgemere, and UMB had a call to discuss extending the Forbearance Agreement. *Id.* A few days later, Levenfeld Pearlstein, ICI's new counsel, sent a letter to Edgemere that alleged that the Forbearance Agreement never became effective, but also agreed to deem it effective if required payments were made to ICI. *See id.*

On or around January 27, 2022, ICI (through its counsel) engaged a public relations firm called The Monument Group ("**TMG**"). ECF No. 576-8 at 55. The engagement letter between ICI and TMG included confidentiality provisions. *Id.* at 56. TMG's scope of work contemplated affirmative outreach to the press about Edgemere's financial condition. *Id.* at 62. To that end, TMG reached out to Natalie Walters, a reporter at the *Dallas Morning News* ("**DMN**"), on or around February 7, 2022. *Id.* at 67-68. In collaboration with Kong, TMG prepared a fact sheet to supply Ms. Walters with a basic understanding of the issues that it wanted to portray regarding Edgemere's financial condition. *Id.* at 69-83. Ms. Walters interviewed Mr. Schlicher and TMG at least three times about CCRCs, in general, and Edgemere, specifically, which were all recorded and transcribed.

On February 27, 2022, DMN published the first of three Walters-authored articles about Edgemere and CCRCs, entitled "*High-end Dallas retirement community's financial woes worry investors, landlord*" (the "**DMN Article**").  *Id.* at 1037-1041.  In response to the DMN Article, the

DMN published a letter to the editor that referred to Edgemere's entrance deposit model as a "Ponzi-like scheme." ECF No. 581-8 at 40.

John Falldine, an Executive Director of Edgemere, testified that after the DMN Article, that "sales pretty much stopped." ECF No. 581-1 at 50. The Edgemere did not have another new deposit until on or around July 28, 2022. ECF No. 581-8 at 52. On April 14, 2022, Edgemere filed its petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

## IV.    **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56, as made applicable by FED. R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Rule 56(c) mandates the entry of summary judgment where, after adequate time for discovery, a plaintiff fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party bears the burden of proof at trial. *Celotex*, 477 U.S. at 322. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. When the moving party has carried its burden under Rule 56(c), its opponent must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586–87 (1986). Only where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party is there no "genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## V.   <u>LEGAL ANALYSIS</u>

### a.   <u>Breach of the NDA – Count 1</u>

Pursuant to Count 1, the Plaintiff brings a claim for breach of the NDA against ICI. Under Texas law, the elements required to prove a claim for breach of contract are: (1) existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by defendant; (4) resultant damages. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003). ICI does not contest the existence of the NDA, nor does it contest that Edgemere performed or tendered performance. ICI contends that the Plaintiff has no evidence to prove breach of the NDA and likewise that the Plaintiff has brought forth no evidence of the damages to the Edgemere resulting from that breach.

Before moving on to an analysis of the remaining elements, the Court finds it necessary to further delineate the terms of the NDA. The NDA defines "Confidential Information" broadly, including "all financial, resident, client, patient (excluding Protected Health Information as that term is defined by HIPAA), vendor, supplier, employee or other business or personal information" (the "**Confidential Information**"). ECF No. 576-4 at 631. Confidential Information includes the existence of the NDA, "information relating to the financial conditions of Edgemere and its negotiations with stakeholders and creditors[,]" and "information relating to business plans, sales or marketing methods, methods of doing business, customer and vendor lists and information[.]" *Id.* Importantly, the following information is excluded from the definition of "Confidential Information":

[I]nformation that (i) was already known to the receiving party at the time that discussions between Lifespace, Edgemere and [ICI] commenced, unless the information is or was subject to a prior confidentiality agreement signed by the parties; (ii) has become publicly known through no wrongful act of the receiving party; (iii) has been received from third party without restriction on disclosure and without breach of an obligation of confidentiality on the disclosing party; (iv) has been independently develop[ed] by the receiving party without breach of this Agreement; (v) has been approved for release by written authorization of the disclosing party; or (vi) is required to be disclosed by law, regulation, governmental proceeding, court order or similar process or otherwise and the provisions of Section 2 of this Agreement have been complied with.

*Id.*

Pursuant to the terms of the NDA, "Permitted Uses" of the Confidential Information include disclosure to a party's "Representatives … for purposes of evaluating the merits and risks associated with the Transaction or to assist such party in exercising its rights under this Agreement, the Ground Lease, or in connection with any reorganization by Lifespace and/or Edgemere." *Id.* at 632. The NDA also states that "a party may disclose, provide and/or furnish Confidential Information … in connection with enforcing any agreement or rights between the parties." *Id.* In the NDA, the parties also agreed "not to use the Confidential information for any purpose other than a Permitted Use and each party specifically agrees not to use the Confidential Information for any competitive purpose." *Id.* at 633.

Bearing these material terms in mind, the Court turns to the remaining elements of the Plaintiff's breach of contract claim. The Court will first address the ICI's purported breach of the NDA. ICI contends that the Plaintiff brought forth no evidence to prove that ICI ever improperly disclosed Confidential Information subject to the NDA and that the Plaintiff brought forth no evidence that ICI or its representatives used Confidential Information to compete with the Edgemere.

ICI contends that there is no evidence that it disclosed any Confidential Information in violation of the NDA. In particular, ICI contends that disclosure of Confidential Information to Kong and Levenfeld Pearlstein (ICI's counsel) was permitted under the NDA because they were ICI's "Representatives." Furthermore, ICI asserts that there is no evidence that it or its representatives furnished Confidential Information to Kong's financer, The Baupost Group ("**Baupost**"), the DMN, the Texas Department of Insurance, the Office of the Attorney General, the Edgemere Resident Board, or certain Edgemere residents, namely, Jim Smith, Charles Simmons, and Hilda Simmons as alleged in the Amended Complaint.

The Plaintiff points to several instances where ICI or its representatives may have disclosed Confidential Information in violation of the NDA, including: (1) disclosure to the DMN and Ms. Walters that Edgemere owed $25 million of refunds to residents who had moved out and whose units had been reoccupied [*See* ECF No. 581-5 at 13; *see also* ECF No. 581 at 16-17]; and (2) disclosure to the DMN and Ms. Walters that the final deadline for cure of the Lease was March 11, 2022 [*See* ECF No. 581-3 at 60-61]. Both of these instances, at minimum, show that there is a genuine issue of material fact as to whether Confidential Information was disclosed in violation of the NDA.

Furthermore, ICI contends that the Plaintiff has brought forth no evidence to show that Confidential Information was used for a competitive purpose in violation of the NDA. Specifically, ICI argues that the NDA permitted the parties to use Confidential Information "in connection with enforcing any agreement or rights between the parties," including the Lease. *See* ECF No. 576-4 at 42. ICI argues that its actions constituted "contingency planning," which falls squarely within the permitted uses of the NDA. First, ICI argues that it used the Confidential Information to determine how it would proceed following Edgemere's default under the Lease. Second, ICI argues

that the NDA permitted the use of the Confidential Information in evaluating the risks and merits of the various strategic, business and/or financial options relating to the Lease.

The Plaintiffs contend that there is substantial evidence that ICI and its representatives used Confidential Information for competitive purposes in violation of the NDA. For example, on November 22, 2021, Kong proposed deal terms to ICI regarding a partnership between Kong and ICI relating to the Edgemere facility. ECF No. 581-5 at 24-25. Pursuant to the proposed joint venture, Kong would manage the negotiations through the bankruptcy process, be the public face of the transaction, be responsible for converting the Edgemere to a rental community, and thereafter manage the community. *Id.* Further, on December 21, 2021, Kong and ICI entered into a letter agreement documenting a "good faith understanding" that if ICI retook the property, then Kong would enter a new ground lease with ICI on the same term and financial structure as Edgemere's existing Lease, but with an additional payment to ICI. *See id.* at 8. There is also evidence to show that Confidential Information may have been shared with Kong prior to Kong's becoming an agent of ICI, while Kong and ICI were discussing potential joint venture deals. Therefore, the Court determines that there is a genuine issue of material fact that will need to be decided at trial as to whether ICI used Confidential Information for a competitive purpose.

Finally, ICI argues that the Plaintiff has brought forth no evidence linking any damages to a breach of the NDA by ICI or its representatives. The Plaintiff contends that ICI's breach of the NDA resulted in prospective residents cancelling visits or withdrawing deposits based on the publishing of the DMN Article. The Plaintiffs assert that the Defendants violated the NDA by giving Confidential Information to the DMN, which later published the information in the DMN Article. The Plaintiff points out that after the publishing of the DMN Article there was a complete cessation of sales activity. *See* ECF No. 581-15. A trier of fact could determine that this

circumstantial evidence has a sufficient nexus to the damages claims by the Plaintiff. Therefore, the Court determines that there is a genuine issue of material fact that exists in determining whether ICI's alleged breach of the NDA resulted in the damages claimed by the Plaintiff. Therefore, the Court recommends that the District Court deny the MSJ as to Count 1.

### b.  Breach of Forbearance Agreement – Count 6

Pursuant to Count 6, the Plaintiff brings a claim for breach of the Forbearance Agreement against ICI. As previously stated, the elements required to prove a claim for breach of contract are: (1) existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by defendant; (4) resultant damages. *Lewis*, 343 F.3d at 544-45. The Plaintiff asserts that a breach of the NDA also constitutes a breach of the Forbearance Agreement because the NDA is incorporated into the Forbearance Agreement. ICI does not deny that the NDA is incorporated into the Forbearance Agreement.[3] In accordance with its above determination that there is a genuine issue of material fact as to the breach of the NDA and the disclosure of Confidential Information, the Court also recommends that the District Court deny the MSJ as to Count 6 for breach of the Forbearance Agreement.

### c.  Promissory Fraud – Count 2

In addition to his breach of contract claims, pursuant to Count 2, the Plaintiff brings a claim for promissory fraud against ICI. The Plaintiff alleges that ICI entered the NDA and the Forbearance Agreement without the present intent to perform. In particular, the Plaintiff advances that ICI entered the NDA "to gain Edgemere's Confidential Information" and "use [it] to Edgemere's detriment and to destroy Edgemere's business." ECF No. 422 at ¶ 172. Under Texas

---

[3] During the Hearing, counsel for the Defendants affirmatively agreed that "the Forbearance Agreement incorporated the NDA by reference … So a breach of the one is a breach of the other." ECF No. 593 at 53.

Law, the elements of a fraud claim are: (1) a material representation; (2) that was false when made; (3) the speaker knew it was false or made it without knowledge of its truth of falsity; (4) the speaker intended that the representation be relied upon; (5) the Plaintiff acted in reliance on the representation; and (6) the plaintiff was injured as a result. *Cheetah Gas Co., Ltd. v. Chesapeake Louisiana, L.P.*, No. Civ. A. H-08-3237, 2009 WL 499051, at *2 (S.D. Tex. Feb. 25, 2009). Further a promise of future performance can constitute fraud only if "the promise was made with no intention of performing at the time it was made." *Id.* (quoting *Guidry v. United States Tobacco Co.*, 188 F.3d 619, 632 (5th Cir. 1999)).

ICI asserts that that the promissory fraud claim fails because there is no evidence that ICI entered the NDA without the intent to perform. Further, ICI contends that the "purported plan [between ICI and Kong] the Plaintiff advances as evidence that ICI never intended to perform under the NDA was not hatched until some two months later—*even under Plaintiff's own allegations*." ECF No. 575 at 42. (emphasis in original). ICI points to the facts, as pled in the Amended Complaint, that the NDA was executed on September 7, 2021, and that Kong's first call to ICI occurred in November 2021. ICI argues that, under the Plaintiff's own theory, Kong was the genesis of the alleged takeover plan, and that Kong did not come onto the scene until *after* the NDA was executed. ICI asserts that since Kong first contacted ICI *after* the NDA was executed, that the Plaintiff lacks evidence to show that ICI lacked the present intent to perform under the NDA at its inception.

The Court agrees. The Plaintiff has brought forth no evidence to show that ICI lacked the present intent to perform under the NDA at its inception. While the Plaintiff has pointed to evidence occurring *after* the NDA was signed, there is no evidence that ***at the time the NDA was signed*** that ICI did not have the present intent to perform under the NDA. This is further bolstered by the later

arrival of Kong (approximately two months after the NDA was executed), which the Plaintiff claims was the "mastermind" of the plan to take over the Edgemere. Therefore, the Court recommends that the District Court grant the Defendants' MSJ as to the Plaintiff's claim for promissory fraud related to the NDA.

With regard to promissory fraud relating to the Forbearance Agreement, ICI argues that the Plaintiff's contention that Edgemere would not have entered the Forbearance Agreement had it known ICI did not intend to perform under it is false because Edgemere's rent defaults would have led to a termination of the Lease absent a forbearance agreement with ICI. Therefore, ICI argues that Edgemere's claimed reliance on ICI's promises to perform did not harm the Edgemere. The Plaintiff counters by stating that ICI and Kong had been discussing potential terms of a joint venture for more than a month before the Forbearance Agreement was signed on December 21, 2021. *See* ECF No. 581-5 at 24; ECF No. 581-12 at 1-3. Furthermore, the Plaintiff points to the fact that Kong and ICI had agreed in writing as of December 14, 2021, that Kong would be the new lessee under a new ground lease for the Edgemere facility if Edgemere went into bankruptcy. See ECF No. 581-5 at 8.

As mentioned above, the NDA was incorporated as part of the Forbearance Agreement. Therefore, if ICI, after entering into the NDA, but before entering into the Forbearance Agreement, intended to use Confidential Information for a competitive purpose, then it did not intend to perform under the terms of the Forbearance Agreement when it was entered. The Court has determined above that there is a factual dispute as to whether ICI used Confidential Information for a competitive purpose, which would constitute a breach of both the NDA and the Forbearance Agreement. Because there is evidence that ICI had already agreed that Kong would be the new lessee if Edgemere went into bankruptcy, there is a factual dispute as to whether ICI had the present

18

intent to perform under the Forbearance Agreement when it was signed. Therefore, the Court recommends that the District Court deny the MSJ as to the Plaintiff's claim for promissory fraud as it relates to the Forbearance Agreement.

### d.  <u>Business Defamation and Disparagement – Count 5</u>

Pursuant to Count 5, the Plaintiff brings a claim for business defamation and disparagement against ICI and Kong for communications with the DMN, certain residents, and the bondholders which "imputed to Edgemere some kind of fraud, deceit, dishonesty, or reprehensible conduct in its business." ECF No. 422 at ¶ 203. To state a defamation claim under Texas law, a plaintiff must show: (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, at least amounting to negligence, and (4) damages, in some cases. *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020). The elements of business disparagement are even more stringent than those of defamation because business disparagement protects economic interests against a pecuniary loss. *Id.* The publication of a disparaging statement concerning the product of another is actionable when: (1) the statement is false, (2) published with malice, (3) with the intent that the publication cause pecuniary loss or the reasonable recognition that it will, and (4) pecuniary loss does in fact result. *Id.*

To be actionable, a statement must be a factual assertion; expressions of opinion are not actionable. *Teel v. Deloitte & Touche LLP*, No. 3:15-cv-2593-G, 2015 WL 9478187, at *4 (N.D. Tex. Dec. 29, 2015). "Whether an alleged defamatory statement constitutes an opinion rather than a verifiable falsity is a question of law." *Lilith Fund for Reproductive Equity v. Dickson*, 662 S.W.3d 355, 362 (Tex. 2023). To evaluate this question, courts focus "the analysis on a statement's

verifiability and the entire context in which it was made." *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002).

### i. The Gist Analysis

The Plaintiff alleges that the Defendants shaped the DMN Article by omitting and juxtaposing facts to create a false and defamatory meaning. The Plaintiff specifically alleges that the following statements and omissions contained in the DMN Article are false and misleading, which gives the DMN Article a defamatory meaning:

- Kong did not disclose its potential financial interest in the Edgemere when it approached Ms. Walters about the story.
- Kong did not disclose to Ms. Walters that it had the ability to become the lessee if Edgemere went into bankruptcy.
- There are multiple references in the DMN Article to falling occupancy levels which are directly contrary to the post-COVID increase in independent living occupancy in 2021.
- Refences to 150 days of cash on hand in the DMN Article is misleading because it ignores the money coming in from residents every month. Furthermore, Edgemere did not believe it would run out of cash in 62 days despite the DMN Article stating that Edgemere only had enough cash to stretch through March 3, 2022.
- Mr. Schlicher's statement that "It's unfair and unjust for Edgemere to continue to take deposits from future residents" was false because at that time, all entrance fees for future residents were being escrowed.
- Mr. Schlicher told Ms. Walters that Kong had "extensive experience in managing and operating both healthcare and senior living facilities."
- Mr. Schlicher is quoted in the DMN Article as stating, "I fear the residents are on a sinking ship and some of them may not even know it."
- "Residents risk losing some of their deposits in the event of a bankruptcy."
- "Edgemere does not have the current assets necessary to pay in full its landlord, its bondholders, its resident refunds."
- Finally, the tenor of the entire DMN Article is that there is an immediate financial crisis that could lead to bankruptcy, the loss of resident deposits, and even ICI not keeping the facility running.

ECF No. 578 at 22-25.

In making the initial determination of whether a publication is capable of having a defamatory meaning, courts examine the publication's "gist." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017). To determine a publication's "gist," the court must construe the publication "as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Id.* (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000)). Furthermore, "the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Turner*, 38 S.W.3d at 115.

Under the "substantial truth doctrine," a publication's truth or falsity depends on whether the publication "taken as a whole is more damaging to the plaintiff's reputation than a truthful [publication] would have been." *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016) (quoting *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013)). The Supreme Court of Texas has held that a publication "with specific statements that err in the details but that correctly convey the gist of a story is substantially true." *Neely*, 418 S.W.3d at 63-64 (citing *Turner*, 38 S.W.3d at 115). Conversely, even if all the publication's individual statements are literally true, the story "can convey a false or defamatory meaning by omitting or juxtaposing facts." *Id.* (quoting *Turner*, 38 S.W.3d at 114).

The Court begins its gist analysis with a discussion of the contents of the DMN Article. The article at the center of the dispute in this case is entitled "*High-end Dallas retirement community's financial woes worry investors, landlord.*" ECF No. 581-5 at 1. The DMN Article begins with a discussion of how Edgemere, "one of Dallas' premier retirement communities," faces threats to its financial health from falling occupancy levels and the expiration of the Forbearance Agreement between it, ICI, and the bondholders. *Id.* The DMN Article also walks through

information from Edgemere's various public filings with the Electronic Municipal Market Access ("**EMMA**"). *Id.*

The DMN Article includes direct quotes from Coe Schlicher, Kong's CEO, stating that "[i]t's unfair and unjust for Edgemere to continue to take deposits from future residents under current circumstances[.]" *Id.* at 2. The DMN Article also includes a quote from Mr. Schlicher, which states "I feel the residents are on a sinking ship and some of them may not even know it[.]" *Id.* Amongst the quotes from Mr. Schlicher, the DMN Article also discloses that ICI hired Mr. Schlicher's firm (Kong) to "help it find a solution" given Edgemere's financial situation. *Id.*

In addition to quoting Mr. Schlicher, the DMN Article includes quotes from Rachel Chesley, a member of the commination team with FTI Consulting, one of Edgemere's financial advisors, that counter certain of Kong and ICI's assertions. *Id.* Ms. Chesley is quoted as stating that Edgemere had "productive discussions" with ICI over the delayed rent payments. *Id.* Furthermore, Ms. Chesley is attributed as saying that "despite [Edgemere's] full compliance with the terms of the [Forbearance Agreement] and productive discussions, [ICI] failed to extend the [Forbearance Agreement] and has sought to terminate the [Lease.]" *Id.* Ms. Chesley states that Edgemere had not yet decided how it would move forward but that "any path forward will allow Edgemere to continue operations uninterrupted, maintaining the health and lifestyle of our residents[.]" *Id.* In the DMN Article, Ms. Chesley counters Mr. Schlicher's assertion regarding the resident deposits, being quoted as stating that Edgemere created an escrow account "to ensure [new resident deposits] are not at risk." *Id.* Finally, the DMN Article includes Ms. Chesley's criticism of ICI for "its interference with Edgemere's relationship with its bondholders, regulators and residents" and insistence that the discussions will have "no impact to [Edgemere's] current residents." *Id.*

The DMN Article includes a discussion of various reasons for Edgemere's financial decline including, increased competition from newer luxury senior living communities in Dallas, the COVID-19 pandemic, and struggles in the senior care market generally. *Id.* at 3. With respect to the Edgemere's entrance fee model, Mr. Schlicher is again quoted, stating that "residents risk losing some of their deposits in the event of a bankruptcy filing." *Id.* at 4. Citing Edgemere's EMMA reports, the DMN Article notes that Edgemere's annual losses have accelerated in recent years, from $12 million in 2018 to about $30 million in 2021, and that the bondholders were "no longer waiting" and would "seek immediate payment from Edgemere of its outstanding debt." *Id.* at 2, 4. The DMN Article reports that Fitch Ratings had downgraded Edgemere's bonds to a D, which stands for default, quoting Kevin Holloran, a Fitch senior director and sector leader of its not-for-profit health care group, as stating that: "Once an organization gets to a D, there's not a lot of surveillance left that we can do because that's the worst-case scenario[.]" *Id.* at 4.

The DMN Article concludes with the viewpoints of certain residents and their families as it pertains to Edgemere's financial situation. Thomas Murphy, whose mother-in law is a resident of the Edgemere, is quoted as stating that he noticed the decline in residency, but that Edgemere came "through the pandemic with flying colors" in terms of care provided to residents. *Id.* at 4-5. In a further positive light, Dr. Paul Radman, the president of the Edgemere Resident Association, is quoted as stating that he was not worried and that he believed that "Edgemere will survive." *Id.* at 5.

The Plaintiff argues that the DMN Article has a defamatory gist by creating the impression that Edgemere was running a "Ponzi-esque" scheme. *See* ECF No. 578 at 22. Although the word "Ponzi" does not appear in the DMN Article, the Plaintiff points to a letter to the editor sent to the DMN in response to the DMN Article to show that the DMN Article gave that impression. *See*

ECF No. 581-8 at 40. In the letter, James R. Bridges from Fate, Texas talks about the Edgemere's entry fee model and asks if the Attorney General's office has "determined that the Ponzi-like scheme of deposits and refunds is legal and appropriate?" *Id.* The Plaintiff also relies upon internal memoranda between Kong and TMG, ICI's public relations firm, which outline their intent to frame the situation at the Edgemere as a "Ponzi-esque" financing structure. *See id.* at 13-20.

The Court takes issue with Plaintiff's reliance on the letter to the editor and the internal memoranda because neither of these sources of information (although admittedly negative and indicative of intent to cast a negative light on the Edgemere) are part of the actual DMN Article itself. The DMN Article never expressly accuses the Edgemere of having a "Ponzi-esque" financing structure.[4] The gist of the DMN Article's must be based on "a reasonable person's perception of the entirety of [the article] and not merely on individual statements." *Turner*, 38 S.W.3d at 115. Viewing the DMN Article as a whole, the Court concludes that a reasonable person could not perceive it as a having a false and defamatory meaning. On the contrary, the DMN Article provides a balanced view on the Edgemere's financial outlook that is sourced with quotes from representatives of ICI/Kong, Edgemere, Fitch, the bondholders, and Edgemere residents. It is neither wholly negative nor positive. It is a balanced take on the Edgemere's financial picture. As the Supreme Court of Texas stated in *Neely*, statements in the DMN Article may have "err[ed] in the details" or could have contained more information for particular clarity, but, in this Court's estimate, it was not objectively defamatory. *See* 418 S.W.3d at 65-64. Overall, the Court finds that a reasonable person could not perceive the DMN Article to have a false and defamatory gist.

---

[4] The Court reviewed three interview transcripts between and among Ms. Walters, ICI, Kong, TMG, and Levenfeld Pearlstein. *See* ECF Nos. 581-3 & 581-4. The Court could not find any evidence that the term "Ponzi" was uttered to Ms. Walters. *See id.* Furthermore, the Court cannot find any evidence in the record to indicate that the Defendants ever told a third party, outside of perhaps their public relations firm, that Edgemere had a "Ponzi-esque" financing structure.

## ii.  The Actionability of the Individual Statements

The Court will next examine each of the individual statements and omissions that the Plaintiff alleges are defamatory on their own. "[S]tatements that are not verifiable as false cannot form the basis of a defamation claim." *Neely*, 418 S.W.3d at 62 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21-22 (1990)). The Supreme Court of Texas made clear that *Milkovich* requires that courts focus not only "on a statement's verifiability," but also on "the entire context in which it was made." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018). Moreover, even when a statement is verifiable as false, it does not give rise to liability if the "entire context in which it was made" discloses that it is merely an opinion masquerading as fact. *Id.* Therefore, statements that cannot be verified, as well as statements that cannot be understood to convey a verifiable fact, are opinions. *Id.*

Furthermore, courts have noted that "expressions of opinion may be derogatory and disparaging; nevertheless they are protected by the First Amendment of the United States Constitution and by article I, section 8 of the Texas Constitution." *Shaw v. Palmer*, 197 S.W.3d 854, 857 (Tex. App.—Dallas 2006, pet. denied) (citing *Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); *Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 340 (Tex.App.-San Antonio 1988, writ denied)). For instance, in *Shaw*, the court found that an employer calling an employee "crazy" was not defamation but rather a non-actionable expression of opinion. *Id.* at 858. Additionally, in *Lilith Fund*, the Supreme Court of Texas held that statements that abortion activists were "criminal" and advocated for "murder" were non-actionable statements of opinion in the context of the national debate on abortion policy. *Lilith Fund*, 662 S.W.3d at 368.

The Court will begin with two of Mr. Schlicher's statements that the Plaintiff argues are specifically defamatory: (1) "It's unfair and unjust for Edgemere to continue to take deposits from future residents under current circumstances;" and (2) "I fear the residents are on a sinking ship and some of them may not even know it." *See* ECF No. 581-5 at 1. Statements regarding the notions of justice and fairness are typically regarded as non-actionable opinions. *See Lilith Fund*, 662 F.3d at 368; *see also, e.g., La Liberte v. Reid*, 966 F.3d 79, 93 (2d Cir. 2020); *Schmitt v. Artforum Int'l Magazine, Inc.*, 178 A.D.3d 578, 588-89 (2019). Furthermore, Ms. Chesley was also provided an opportunity to rebut Mr. Schlicher's assertions and stated that the Edgemere created an escrow account "to ensure [the deposits were] not at risk." ECF No. 581-5 at 2. Therefore, the Court determines that Mr. Schlicher's statement that it is "unfair and unjust" for Edgemere to continue to collect entrance deposits is an unverifiable statement of opinion that is non-actionable.

The Court also determines that Mr. Schlicher's statement that he feared "the residents are on a sinking ship" is non-actionable because it states Mr. Schlicher's opinion. Courts have held that "loose and figurative term[s] employed as metaphor or hyperbole" are expressions of opinion. *Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (finding the term "lawsuit abuse" to be indefinite and ambiguous); *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 512 (Tex. App.—Tyler 2008, pet. denied) (finding the use of the word "obscene" to describe a gesture without further description to be subjective and indefinite); *Shaw*, 197 S.W.3d at 858 (finding that the use of the term "crazy" was indefinite and ambiguous). Mr. Schlicher's statement that "residents are on a sinking ship" is a metaphor that conveys an expression of opinion and is thus non-actionable.

The Plaintiff also claims that Kong's statements and omissions about itself also constituted business disparagement. *See* ECF No. 578 at 22-25. In particular, the Plaintiff claims that the

following are material misstatements by Kong to the DMN: (1) Kong did not disclose its potential financial interest in the Edgemere; (2) Kong did not disclose that Kong had the ability to become the lessee if Edgemere went into bankruptcy; and (3) Kong telling Ms. Walters that it had "extensive experience in managing and operating both healthcare and senior living facilities." *Id.* While these statements may have been false, or Kong's lack of disclosure misleading, the Supreme Court of Texas has affirmatively held that "a statement must concern *the plaintiff* to be defamatory." *Lilith Fund*, 662 S.W.3d at 367 (emphasis added). Therefore, these statements and omissions about Kong are non-actionable as defamation because they are not about the Edgemere.[5]

The Plaintiff also takes issue with the reference in the DMN Article to Edgemere's EMMA filings that stated that it had "fallen far below a requirement to keep 150 days of cash on hand" and that it only had "62 days worth of cash." *See* ECF No. 581-5 at 1-2. There is no evidence in the summary judgment record that proves that the Defendants ever told Ms. Walters about how much cash Edgemere had on hand. Furthermore, based on the reporting in the DMN Article, Ms. Walters discovered this information from the Edgemere's own public EMMA filings. Furthermore, given the information is both sourced and dated, it is not verifiably false. Therefore, the Court determines that these statements are not actionable against the Defendants.

The Plaintiff takes further issue with the statement that "Edgemere does not have the current assets necessary to pay in full its landlord, its bondholders, [and] its resident refunds." This statement is non-actionable because it is a true statement, which the Plaintiff admits. See ECF No. 578 at 25. Furthermore, the Plaintiff also takes issue with Mr. Schlicher's statement that "[r]esidents risk losing some of their deposits in the event of a bankruptcy." *Id.* at 24. Although the

---

[5] The Court also determines that it is obvious from the DMN Article that Kong is aligned with ICI. The DMN Article specifically states that ICI hired Kong. *See* ECF No. 581-5 at 2. Accordingly, a reader could not objectively regard Kong as an independent third party.

residents ultimately did not lose their deposits through the bankruptcy, there was, at least, a risk that they could have lost some rights with regard to their deposits during a bankruptcy process. Therefore, this statement is also non-actionable because it is either substantially true or not verifiably false.

Finally, the Plaintiff asserts that the multiple references in the DMN Article to falling occupancy levels are false because the claims are directly contrary to Edgemere's post-COVID increase in independent living occupancy in 2021. *See* ECF No. 578 at 23. To substantiate her reporting that Edgemere's occupancy had declined over the years, Ms. Walters based her reporting on Edgemere's 2021 financial report which stated that occupancy had declined from "93.3% in 20178 to 74%" in 2020. See ECF No. 581-5 at 3. Ms. Walters also reported that "Edgemere's occupancy decline during COVID-19 was seen broadly across the senior housing industry, which was 'hammered,' according to an annual report by research firm Integra Realty Resources. It sees demand surging in the next 12 months[.]" *Id.* Ms. Walters included comments regarding the declining occupancy levels from Rebecca Greive, an associate director at Fitch, and Thomas Murphy, a family member of an Edgemere resident. *Id.* at 4. The Plaintiffs have shown that Mr. Schlicher told Ms. Walters about the declining occupancy rates. *See* ECF No. 581-3 at 50. Nevertheless, the Court determines that Ms. Walters' reporting on this issue was substantially true. While it may be true that occupancy rates were not actively falling when the DMN Article was published, the DMN Article includes the relevant time periods and sources for its statement that the occupancy rates had gone down. The DMN Article also includes an independent opinion from Integra Realty Resources that demand for senior care facilities was expected to "surge" in the aftermath of COVID. Therefore, the Court finds that the DMN Article's information on the Edgemere's occupancy was substantially true. *See Neely*, 418 S.W.3d at 63-64.

Overall, taking the DMN Article as a whole, the Court determines that a reasonable person could not perceive the DMN Article to have a false and defamatory meaning. Furthermore, the Court determines that each of the individual statements that the Plaintiff's alleges are false or defamatory are non-actionable either because they were verifiably true, substantially true, not about the Edgemere, or opinions. As such, the Court recommends that the District Court grant summary judgment in favor of the Defendants on Count 5 for business disparagement and defamation.

### e.  <u>Tortious Interference with Existing Contracts – Count 3</u>

Pursuant to Count 3, the Plaintiff alleges that Kong tortiously interfered with the Lease, the NDA, and the Forbearance Agreement. To prove tortious interference with an existing business relationship or raise a genuine dispute of material fact, a plaintiff must establish that there was: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Premier Elecs., LLC v. ADT, LLC*, No. 3:18-CV-2036-L, 2023 WL 3963832, at *6 (N.D. Tex. June 12, 2023) (quoting *Nix v. Major League Baseball*, 62 F.4th 920, 934 (5th Cir. 2023)). The Defendants allege that the Plaintiff's claim against Kong fails for two reasons, primarily (1) that ICI did not breach any of the contracts at issue; and (2) Kong was ICI's agent and an agent is legally incapable of tortiously interfering with its principal's contracts. ECF No. 566 at 39.

To prevail on a tortious interference with existing contracts claim, the plaintiff must "present evidence that some obligatory provision of a contract [was] breached." *WickFire, L.L.C. v. Laura Woodruff; TriMax Media, L.L.C.*, 989 F.3d 343, 354 (5th Cir. 2021), as revised (Mar. 2, 2021) (citing *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 749 (5th Cir. 2019)). As this Court has previously stated, the Court determines that there is a genuine issue of material fact as

to whether ICI breached the NDA and the Forbearance Agreement. As such, the Court finds that the Plaintiff has met its burden to survive summary judgment as to this element by presenting some evidence that ICI breached both the NDA and the Forbearance Agreement.

Turning to the Defendants' second argument that Kong was legally incapable of tortiously interfering with its ICI's contracts because it was ICI's agent, generally, the acts of a corporate agent on behalf of his or her principal are deemed to be the corporation's acts. *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003). To show that an agent has interfered with its principal's contract, a plaintiff must prove that the agent acted solely in "furtherance of [its] personal interests so as to preserve the logically necessary rule that a party cannot tortiously interfere with its own contract." *Id.* (quoting *Holloway v. Skinner*, 898 S.W.2d 793, 796). The plaintiff may satisfy its burden by proving that the agent acted "so contrary to the corporation's interests that [its] actions could only have been motivated by personal interest." *Id.* (quoting *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 432). Further, an agent cannot be held to have acted against the principal's interest unless the principal has objected. *Id.*

The Plaintiff disputes that Kong acted as ICI's agent at all times when the alleged tortious interference took place. The Defendants retread an argument from their Motion for Judgment on the Pleadings that the Plaintiff admits that Kong was ICI's agent by alleging in the "Parties" section of the Amended Complaint that "[a]t all relevant times, Kong has been acting both as an agent for [ICI] and for its own interests." ECF No. 422 at ¶ 16. The Defendants further point out that they admitted the allegation that Kong was working as ICI's agent in their *Answer and Affirmative Defenses to Plaintiff's First Amended Complaint*. See ECF No. 429 at ¶ 16. As the Court previously ruled in its 12(c) Order, "the Court construes Paragraph 16 [of the Amended Complaint] to mean that Kong was acting either as an agent for ICI and/or for their own self interests." ECF No. 517

at 12. Therefore, this admission alone does not conclude the Court's inquiry into whether there is a sufficient factual dispute for Count 3 to survive summary judgment.

The Plaintiff points to the following facts to show that there is a dispute as to whether Kong acted as ICI's agent when it allegedly tortiously interfered with the NDA and the Forbearance Agreement. The NDA provides that "each party specifically agrees not to use the Confidential Information for any competitive purpose." ECF No. 576-4 at 43. The Plaintiff highlights that Kong reached out to ICI on November 9, 2021, with "an alternative plan" to convert the Edgemere building into a rental community. ECF No. 581-12 at 2-3. In the same email, Kong stated that they are "interested in exploring a partnership with [ICI] to reach an agreement with the debtors and convert the building to a rental community." *Id.* Further, on November 22, 2021, Kong sent ICI a "Letter of Intent Draft" that laid out proposed deal terms to start discussions around a partnership between Kong and ICI. ECF No. 581-5 at 24-25. Per Kong's proposal, Kong would manage the negotiations through the bankruptcy process, be the public face of the transaction, be responsible for converting the Edgemere to a rental community, and thereafter manage the community. *Id.* Discussions of the deal points between Kong and ICI continued into December 2021. All of this occurred before Kong enters into its consultancy agreement with ICI on December 13, 2021. *See* ECF No. 581-6. The next day on December 14, 2021, Kong and ICI sign a good faith understanding that would make Kong the new lessee following a pending Edgemere bankruptcy. *See* ECF No. 581-5 at 8. These facts demonstrate that there is a material factual dispute over whether Kong acted as ICI's agent at all times during the alleged tortious interference with the NDA and Forbearance Agreement. As such, the Court recommends that the District Court deny the MSJ as to Count 3 for tortious interference with existing contracts.

**f.**   <u>**Tortious Interference with Prospective Business Relations – Count 4**</u>

Pursuant to Count 4, the Plaintiff brings a cause of action against both Kong and ICI for interfering with prospective contractual relations, namely prospective residents. The elements of tortious interference with prospective business relations under Texas law are: (1) a reasonable probability that the claimant would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately cause the claimant injury; and (5) the claimant suffered actual damage or loss as a result. *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 214 (5th Cir. 2018). To recover for tortious interference with prospective business relations, a plaintiff must prove that the defendant's conduct was independently tortious or wrongful. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).

The Defendants assert that the Court should grant summary judgment for three reasons: (1) absence of independently tortious conduct; (2) absence of resultant harm; and (3) absence of reasonable probability of contracting. A plaintiff seeking to recover for tortious interference with prospective business relationships must establish proximate causation and damages with evidence raising above mere suspicion or speculation. *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 629 (S.D. Tex. 2011). Courts have held that a claim for tortious interference with prospective relations requires the plaintiff to identify specific relationships with which the defendant interfered, or else the defendant is entitled to summary judgment. *See id.*; *see also Pureshield, Inc. v. Allied Bioscience, Inc.,* No. 4:20-CV-734-SDJ, 2021 WL 4492861, at *7 (E.D. Tex. Sept. 30, 2021); *see*

*also In re THEAG N. Arlington LLC,* No. 19-41108-ELM, 2020 WL 7330055, at *31-32 (Bankr. N.D. Tex. Dec. 11, 2020).

Here, the summary judgment record is completely devoid of a specific prospective resident who declined to move into the Edgemere because of any of the Defendants' alleged actions. The Plaintiff presents circumstantial evidence that before the DMN Article came out, the Edgemere had increased resident deposits, reflecting the addition of new residents. *See* ECF No. 581-8 at 46-49 (email titled "Edgemere Hits 50" describing sales as "truly amazing!"). The Plaintiff also presents evidence that following the DMN Article that sales immediately stopped. However, the Plaintiff fails to present any evidence of any *specific* prospective resident that requested their deposit back or refused to go forward with their rental because of any actions caused by the Defendants. As such, the Plaintiff fails to meet his burden of showing that there was a reasonable probability of contracting with a specific prospective resident that was prevented due to the Defendants' actions. Therefore, the Court recommends that the District Court grant the Defendant's MSJ as to Count 4 for tortious interference with prospective business relations.

### g.  Civil Conspiracy – Count 7

Pursuant to Count 7, the Plaintiff brings a civil conspiracy claim against both ICI and Kong, alleging that the two parties worked together in their "scheme to destroy Edgemere's business, wrest control of the company away from Edgemere, convert the Community to an alternative use, and potentially evict Residents from the Community or deny them repayment of the substantial Entrance Fees they previously paid." ECF No. 422 at ¶ 422. Under Texas law, a plaintiff must establish the following elements to prove a cause of action for civil conspiracy: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Apani Southwest,*

*Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 635 (5th Cir. 2002) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). Civil conspiracy is a derivative tort, which means that liability for civil conspiracy depends on participation in an underlying tort. *Homoki v. Conversion Services, Inc.*, 717 F.3d 388, 402 (5th Cir. 2013). A plaintiff must establish a predicate tort to prevail on a civil conspiracy claim. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007).

The Defendants challenge the Plaintiff's civil conspiracy count on two grounds: (1) there is no remaining underlying tort, and (2) Kong was ICI's agent and was legally incapable of conspiring with one another. As the Court has previously determined above, there is a factual dispute as to whether Kong acted as ICI's agent at all times. Therefore, the Court need only analyze whether there is a remaining underlying tort. Here, based on the Court's recommendation, there are at least two torts that survive the summary judgment stage: Count 2 for Promissory Fraud and Count 3 for Tortious Interference with Existing Contracts. Therefore, the Court recommends that the District Court deny the MSJ as to Count 7 for civil conspiracy.

### h.  <u>Equitable Subordination – Count 8</u>

Finally, pursuant to Count 8, the Plaintiff seeks to equitably subordinate ICI's "existing and future claims under the Lease" to all other allowed claims in Edgemere's bankruptcy case, including the residents' claims and the bondholders' claim. ECF No. 422 at ¶ 234. Section 510(c)(1) of the Bankruptcy Code allows a court to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c)(1). To establish equitable subordination, a plaintiff, must satisfy three conditions: (i) the claimant must have engaged in some type of inequitable conduct, (ii) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (iii) equitable subordination of

the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 357 (5th Cir. 1997); *In re Mobile Steel Co.*, 536 F.2d 692, 700 (5th Cir. 1977). Equitable subordination is inappropriate if any one element is not satisfied. *In re Equipment Equity Holdings, Inc.*, 491 B.R. 792, 842 (Bankr. N.D. Tex. 2013).

Further, equitable subordination is remedial, not penal, and in the absence of actual harm, is inappropriate. *Id.* (citing *Wooly v. Faulkner (In re SI restructuring, Inc.)*, 532 F.3d 355, 361 (5th Cir. 2008)). Under Fifth Circuit precedent, equitable subordination has typically been found proper in three scenarios: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors. *Cajun Electric*, 119 F.3d at 357.

The Defendants argue that because Edgemere assumed and assigned the Lease to a third party, ICI has no claim for future rent from Edgemere that may be subordinated. The Defendants also argue that even if ICI's claim could be subordinated, ICI did not engage in any inequitable conduct. Furthermore, the Defendants assert that the Plaintiffs have also not shown how any alleged inequitable conduct harmed any creditors or conferred an unfair advantage on ICI. The Plaintiff counters by stating that "ICI asserted and was allowed several administrative claims based upon certain fees and expenses incurred after the [Petition Date] (the "**Cure Claims**"), with the right to seek additional fees and expenses in this Adversary." ECF No. 578 at 42 (emphasis added). The Plaintiff asserts that the inequitable conduct described throughout the Amended Complaint is sufficient to equitably subordinate all of the previously allowed Cure Claims and counterclaims of ICI. *Id.*

The Court agrees with the Plaintiff that the ICI's administrative claims based on post-petition attorneys' fees associated with this Adversary Proceeding may be subject to equitable subordination. Furthermore, as the Court has discussed at length, the Court finds that there are sufficient factual disputes as to several of the Plaintiff's causes of action. The Plaintiff bases his equitable subordination claim on the causes of action in the Amended Complaint. As such, the Court determines that sufficient factual disputes remain such that the Plaintiff's equitable subordination claim should survive summary judgment. Therefore, the Court recommends that the District Court deny the MSJ as to the Plaintiff's equitable subordination claim.

## VI.    <u>CONCLUSION AND FINAL RECOMMENDATION</u>

In conclusion, the Court determines that material factual disputes exist with regard to Count 1 for Breach of the NDA, Count 3 for Tortious Interference with Existing Contracts, Count 6 for Breach of the Forbearance Agreement, Count 7 for Civil Conspiracy, and Count 8 for Equitable Subordination. As such, the Court recommends that the District Court deny the MSJ as to Counts 1, 3, 6, 7, and 8. The Court further determines that the Defendants have met their burden as to Count 4 for tortious interference with prospective business relations and Count 5 for business defamation and disparagement. As such, the Court recommends that the District Court grant the MSJ as to Counts 4 and 5. Finally, the Court recommends that the District Court grant the MSJ in part as to Count 2 for promissory fraud regarding the NDA but deny the MSJ for promissory fraud regarding the Forbearance Agreement.

### END OF REPORT AND RECOMMENDATION ###